[No. B073286. Second Dist., Div. Seven. Feb. 9, 1994.]

MICHAEL GROSS, Cross-complainant and Appellant, v.
ROBERT ALLEN, Cross-defendant and Appellant;
FERRIS PITTS, Cross-defendant and Respondent.

356

**COUNSEL**

Wilson, Elser, Moskowitz, Edelman & Dicker, Patrick M. Kelly, Vincent D'Angelo and Vincent McGonagle for Cross-complainant and Appellant.

Dummit, Faber & Brown, Craig S. Dummit and Jeffry A. Miller for Cross-defendant and Appellant.

Hillsinger & Costanzo, Thomas E. Tootell and Sarah Yoseloff for Cross-defendant and Respondent.

## OPINION

**WOODS (Fred), J.**—In this medical malpractice-equitable indemnity case, Michael Gross, a psychiatrist, appeals from a judgment notwithstanding the verdict. Robert Allen, a psychiatrist whose motion for judgment notwithstanding the verdict was denied, also appeals.

We find it was error to grant the appealed from motion for judgment notwithstanding the verdict and reverse that part of the judgment. We also find it was proper to deny Dr. Allen's motion for judgment notwithstanding the verdict, and affirm that part of the judgment.

### FACTUAL AND PROCEDURAL BACKGROUND

Karen Joy Scancarello had a history of depression and attempted suicide. In 1982, her psychotherapist, Dr. Crow, referred her to Drs. Allen and Pitts, psychiatrists who primarily relied on drugs, not psychotherapy, to treat their patients. They prescribed Nardil, Halcion and other drugs for Ms. Scancarello. When this drug treatment proved unsuccessful Drs. Allen and Pitts used electroconvulsive therapy on Ms. Scancarello.

In December 1984, having determined the electroconvulsive therapy was also unsuccessful, Drs. Allen and Pitts had Ms. Scancarello admitted to Massachusetts General Hospital where a cingulotomy[1] was performed. But by the end of December 1984 Ms. Scancarello had returned to Los Angeles and was still suicidal. On December 29, 1984, she was admitted to Ingleside Hospital where she attempted to set her clothes on fire. She remained there until February 1, 1985. Dr. Allen was her treating psychiatrist. On February 1, 1985, she was transferred to University of Southern California (U.S.C.) Medical Center and discharged February 7, 1985.

On February 27, 1985, after driving her car into a tree and telling the emergency room doctor that she wanted to kill herself, Ms. Scancarello was readmitted to U.S.C. Medical Center. Sometime later, in the U.S.C. Medical Center, she attempted to strangle herself.

---

[1]Thin probes inserted in the skull burn a small portion of the brain.

Drs. Allen and Pitts continued to treat Ms. Scancarello on an out-patient basis. In April 1985 Dr. Allen believed the risk of Ms. Scancarello committing suicide was very high.

On May 16, 1985, Ms. Scancarello overdosed on 50 Halcion tablets but survived. On May 18, 1985, she was admitted to a Los Angeles County psychiatric hospital. In early June 1985, fearing another overdose, Dr. Allen told Ms. Scancarello's mother, with whom Ms. Scancarello lived, to take away Ms. Scancarello's pills. On June 15, 1985, Dr. Pitts administered 37½ milligrams of Prolixin Decanoate by injection to Ms. Scancarello, a 50 percent increase from her former 2-week dosage.

Prior to June 24, 1985, Ms. Scancarello had two telephone conversations with Dr. Pitts about her intention to enroll as an in-patient in the eating disorder program at Northridge Hospital. Dr. Pitts told Ms. Scancarello "that her illness was too severe to be handled in a hospital on an open unit, that regular programs in eating disorder clinics . . . included discontinuing medications of the type she was on because the medications themselves were what occasioned tremendous weight gain. . . ." During the second telephone conversation Dr. Pitts "yelled" at Ms. Scancarello saying "I forbid you to do this." Ms. Scancarello was crying.

On June 24, 1985, Dr. Gross was the admitting psychiatrist for the eating disorder program at Northridge Hospital. That evening he met, interviewed, and admitted Ms. Scancarello to the program. She did not tell him about her suicide attempts.

The next morning, June 25, 1985, Dr. Gross again saw Ms. Scancarello but only briefly. She was depressed and "disagreeable." That same day Dr. Gross telephoned Dr. Allen, told him Ms. Scancarello was an eating disorder program inpatient, and asked for her psychiatric history.

Dr. Allen made no record of the conversation and had only a vague recollection of it. Dr. Gross did make a record of the conversation, summarizing it in a progress note. The summary read: "Call to Dr. Robert Allen, psychiatrist, treating patient past year. Trial and error to achieve current medications. States patient much improved since surgery and had a complete remission for several weeks after surgery only to relapse to present level. Also seemed to remit for a few days after ECT [electroconvulsive therapy]. Will return to his care after treatment here."

Dr. Allen did not tell Dr. Gross about Ms. Scancarello's suicide attempts.

On the morning of June 26, 1985, Dr. Gross was informed that Ms. Scancarello was in bed, was drowsy, and did not respond to directions to get

out of bed. He sent her to the emergency room where she went into a coma. It was determined she had taken an overdose of Nardil, medication prescribed by Drs. Allen and Pitts. She remained in a coma approximately five weeks and remained hospitalized approximately five months. She suffered severe neurological damage.

On June 20, 1986, Ms. Scancarello filed suit against Northridge Hospital Medical Center, Dr. Gross, and several other Northridge Hospital doctors. She did *not* sue either Dr. Pitts or Dr. Allen.

On November 29, 1988, Dr. Gross filed a cross-complaint for equitable indemnity against Drs. Allen and Pitts.

A pretrial settlement was reached between Ms. Scancarello, Northridge Hospital, and Dr. Gross. Ms. Scancarello settled her case for $429,008, $30,000 from Northridge Hospital, $399,008 from Dr. Gross. Other defendants, Northridge Hospital psychiatrists, were dismissed.

Thereafter, the instant trial on Dr. Gross's cross-complaint for equitable indemnity against Drs. Allen and Pitts proceeded. After a 10-day trial the jury rendered special verdicts finding Drs. Allen, Pitts, and Gross each negligent, that their negligence was each a legal cause of Ms. Scancarello's injuries, that the settlement between Ms. Scancarello and Dr. Gross was reasonable, that a portion of the settlement amount "was attributable to the conduct" of Drs. Pitts and Allen, and the percentage of the settlement attributable to the conduct of each psychiatrist was: Dr. Pitts 19 percent, Dr. Allen 6 percent, and Dr. Gross 75 percent.

Both Drs. Allen and Pitts moved for judgment notwithstanding the verdict. The trial court granted Dr. Pitts's motion and denied Dr. Allen's motion. Judgment was entered accordingly.

The instant separate appeals by Dr. Gross and Dr. Allen followed.

DISCUSSION

1. *The granting of Dr. Pitts's motion for judgment notwithstanding the verdict.*

"The trial judge's power to grant a judgment notwithstanding the verdict is identical to his power to grant a directed verdict. . . . The trial judge cannot weigh the evidence . . . , or judge the credibility of witnesses. . . . If the evidence is conflicting or if several reasonable inferences may be

drawn, the motion for judgment notwithstanding the verdict should be denied. . . . 'A motion for judgment notwithstanding the verdict of a jury may properly be granted only if it appears from the evidence, viewed in the light most favorable to the party securing the verdict, that there is no substantial evidence to support the verdict. If there is any substantial evidence, or reasonable inferences to be drawn therefrom, in support of the verdict, the motion should be denied.' " (*Hauter* v. *Zogarts* (1975) 14 Cal.3d 104, 110 [120 Cal.Rptr. 681, 534 P.2d 377, 74 A.L.R.3d 1282], internal citations omitted.)

The trial court granted Dr. Pitts's motion for judgment notwithstanding the verdict because it found "there is no evidence of substance to sustain Dr. Gross' case against Dr. Pitts."

■ On appeal, Dr. Pitts concedes there *was* substantial evidence of his negligence and legal responsibility for Ms. Scancarello's injury but contends the trial court's ruling was correct for another reason. (*Mayflower Ins. Co.* v. *Pellegrino* (1989) 212 Cal.App.3d 1326, 1332 [261 Cal.Rptr. 224].) That reason, according to Dr. Pitts, is "a party seeking indemnity must demonstrate that the amount paid to plaintiff was in excess of the settling defendant's proportionate share of *liability*." (Italics added.) Dr. Pitts argues that the $399,008 paid by Dr. Gross was in settlement of only *his* liability and did not include any amount for the potential liability of Dr. Pitts. That being the case, the argument continues, Dr. Gross failed to prove he paid in excess of his proportionate share of liability to Ms. Scancarello. Further, Dr. Pitts *denies* that his argument would require "that for Dr. Gross to prevail, he must first establish plaintiff's damages."

For several reasons, Dr. Pitts's contention is mistaken.

First, there was substantial evidence that the $429,008 settlement represented Ms. Scancarello's *entire* claim. Her attorney, who filed the complaint and secured the settlement, Richard Feinberg, testified as follows:

"Q Now, in your own mind did that [the settlement] represent to you a reasonable settlement of Karen's case?

"A Under all the circumstances, yes.

"Q Now, you weren't just settling part of Karen's case, were you?

"A No.

"Q You were settling the entire claim of Karen.

"A Absolutely.

"Q Based on all of her damages, all of her injuries, all of her future necessities as a result of the injuries she sustained, correct?

"A That's correct."

Second, Dr. Pitts is mistaken that the referent of "excess proportionate share" is *liability* rather than *settlement*.

As Justice Johnson wrote for this unanimous court in *Mullin Lumber Co.*, "The strong policies in favor of maximizing recovery to the injured party, settling cases and apportioning fault would be seriously impaired if we required a settling defendant to prove its own fault before seeking indemnity against others it alleges contributed to the plaintiff's injury." (*Mullin Lumber Co.* v. *Chandler* (1986) 185 Cal.App.3d 1127, 1132 [230 Cal.Rptr. 122].) He further stated, "We hold in an action for equitable indemnity based on comparative fault the settling defendant need only prove the settlement was based on a reasonable estimate of its liability at the time of the settlement. . . . [¶] Furthermore, the party seeking indemnity must prove payment of the settlement amount . . . and that the settlement amount was reasonable." (*Id.* at pp. 1134-1135.)

Dr. Pitts's position is inconsistent with *Mullin Lumber Co.* Rather than requiring a settling defendant to "only prove the settlement was based on a reasonable estimate of its liability . . . and that the settlement amount was reasonable" (185 Cal.App.3d at pp. 1134-1135), Dr. Pitts would require a settling defendant to prove he overpaid, that his settlement payment exceeded his "inchoate liability." There is no such requirement. To impose one would frustrate the policy "to foster fair resolution of disputes and to avoid needless, time-consuming litigation." (*Id.* at p. 1132.)

Third, neither *Tech-Bilt, Inc.* v. *Woodward-Clyde & Associates* (1985) 38 Cal.3d 488 [213 Cal.Rptr. 256, 698 P.2d 159] nor any other authority cited by Dr. Pitts supports his contention.

2. *The denial of Dr. Allen's motion for judgment notwithstanding the verdict.*

 Dr. Gross presented evidence Dr. Allen was negligent in several respects. We need consider only one: his failure on June 25, 1985, to inform Dr. Gross of Ms. Scancarello's past suicide attempts and present suicide risk.

 Dr. Allen contends he had no duty to so inform Dr. Gross. We disagree.

Dr. Allen correctly but irrelevantly argues that *Tarasoff* v. *Regents of University of California* (1976) 17 Cal.3d 425 [131 Cal.Rptr. 14, 551 P.2d 334, 83 A.L.R.3d 1166] imposed no such duty because Ms. Scancarello, unlike the patient in *Tarasoff*, posed no threat to a third person, only to herself. But *Tarasoff* does not state, as Dr. Allen implies, that a therapist may be silent when to speak may save the life of his patient. To the contrary, to the extent *Tarasoff* considers the matter, it finds a duty to speak. "[W]hen the avoidance of foreseeable harm requires a defendant to control the conduct of another person, or to warn of such conduct, the common law has traditionally imposed liability only if the defendant bears some special relationship to the dangerous person or to the potential victim . . . *the relationship between a therapist and his patient satisfies this requirement. . . .*" (*Id.* at p. 435.) (Italics added.)

Dr. Allen is also mistaken in his reading of *Bellah* v. *Greenson* (1978) 81 Cal.App.3d 614 [146 Cal.Rptr. 535, 17 A.L.R.4th 1118]. In *Bellah* a psychiatrist concluded that his adult outpatient was suicidal, but failed to warn her parents. The patient committed suicide by taking an overdose of pills. Two years later the parents sued the psychiatrist. The psychiatrist demurred, asserting both no duty to warn and the statute of limitations. The Court of Appeal, although it approved the sustaining of the demurrer on time limitation grounds, found a duty and its breach had been sufficiently alleged. The court stated: "Here, the complaint alleged the existence of a psychiatrist-patient relationship between defendant and Tammy, knowledge on the part of the defendant that Tammy was likely to attempt suicide, and a failure by defendant to take appropriate preventive measures. We are satisfied that these allegations are sufficient to state a cause of action for the breach of a psychiatrist's duty of care towards his patient. The nature of the precautionary steps which could or should have been taken by defendant presents a purely factual question to be resolved at a trial on the merits . . . ." (*Id.* at p. 620; see also *Jacoves* v. *United Merchandising Corp.* (1992) 9 Cal.App.4th 88, 105-106 [11 Cal.Rptr.2d 468].)

■■■ As in *Bellah*, there was substantial evidence of a psychiatrist-patient relationship between Dr. Allen and Ms. Scancarello,[2] knowledge by Dr. Allen that Ms. Scancarello was likely to attempt suicide, and a failure by Dr. Allen to take appropriate preventive measures—simply informing Dr. Gross of this risk.

Dr. Allen also obliquely argues "the record reveals confusion as to whether the scope of a psychiatrist's general duty of care requires disclosure

---

[2]Dr. Allen began treating Ms. Scancarello three years before she was admitted to Northridge Hospital and he told Dr. Gross he would continue treating her when she left that hospital.

of confidential information to another psychiatrist." Dr. Allen's testimony reflects no such confusion. When asked "Was there any reason in your own mind which would have prevented you from discussing Karen's full history with [Dr. Gross]?" his unequivocal answer was "no."[3]

We find no error in the trial court's denial of Dr. Allen's motion for judgment notwithstanding the verdict.

### DISPOSITION

That part of the judgment awarding $24,000.48 in favor of Dr. Gross against Dr. Allen is affirmed.

The order granting Dr. Pitts's motion for judgment notwithstanding the verdict is vacated. That part of the judgment decreeing that Dr. Gross take nothing from Dr. Pitts is reversed. The matter is remanded to the trial court with directions to enter a new order denying Dr. Pitts's motion for judgment notwithstanding the verdict and to enter judgment according to the jury's verdict.

Costs on appeal are awarded to Dr. Gross and shall be paid equally by Drs. Allen and Pitts.

Lillie, P. J., and Johnson, J., concurred.

---

[3]See Evidence Code section 1024; *Bellah* v. *Greenson*, *supra*, 81 Cal.App.3d 614, 622, footnote 2.