[No. H016390. Sixth Dist. Jan. 7, 1998.]

VALERIE KOCKELMAN, Plaintiff and Appellant, v.
JONATHAN SEGAL et al., Defendants and Respondents.

COUNSEL

John F. Schuck for Plaintiff and Appellant.

Dryden, Margoles, Schimaneck, Kelly & Wait and Susan E. Foe for Defendants and Respondents.

OPINION

**BAMATTRE-MANOUKIAN, J.**—In this wrongful death action, Valerie Kockelman alleged that psychiatrist Dr. Jonathan Segal and the Palo Alto Medical Foundation for Health Care, Research and Education, were negligent in treating her husband, William Kockelman, for his chronic depression, and that this negligence was a proximate cause of her husband's suicide. The trial court granted summary judgment in favor of defendants, finding as a

matter of law that there was no duty owed to the decedent because he was being treated as an outpatient rather than in a hospital setting. We have concluded that this is not the law in California. We therefore reverse the judgment.

## BACKGROUND

The following facts are taken from medical reports and depositions and are not in dispute.

William Kockelman suffered from chronic depression throughout his life. By his own account, he had been depressed "since the age of 1 or 2." In 1988, at his wife's request, Kockelman consulted with Dr. Straw, his primary physician at the Palo Alto Medical Clinic (the Clinic), complaining that his depression had been worsening, that he had been unable to sleep and that he had been feeling emotional. Dr. Straw's notes indicate that Kockelman "deserves psychiatric evaluation" and "may need to be on antidepressants." He referred Kockelman to Dr. Walsh for evaluation.

Dr. Walsh saw Kockelman four times in 1988. Kockelman told her he had never seen a psychiatrist, although he had been advised to do so 30 years ago. He reported that during the last few years he had been more depressed than usual and that he had episodes, as frequently as twice a month, where he did not get out of bed for two or three days at a time. Dr. Walsh's notes state that Kockelman "has never been suicidal, although at times he has wished that he were dead." Dr. Walsh concluded that Kockelman had "a chronic low-level depression with episodically superimposed periods of more acute depression." She recommended individual long-term psychotherapy and also couples therapy for both of the Kockelmans. Her notes indicate that William Kockelman called after their last appointment and said he was "not interested in pursuing treatment at this point."

In 1991, Valerie Kockelman saw Dr. Straw at the Clinic and expressed concern about Kockelman's deepening depression. She reported that her husband was missing work and "doesn't seem to have much interest in life and has even made some vague threats about taking his own life." The doctor advised her to talk to Kockelman and offer to help him get psychiatric help.

In April of 1992, Valerie Kockelman noticed some cuts on her husband's wrists. She urged him to go back and talk to Dr. Straw or someone else at the Clinic. Dr. Straw's notes from that month state that Kockelman " 'is becoming more dysfunctional, sometimes unable to work for two out of five days

per week,' " and that " '[h]e has occasionally contemplated suicide.' " He referred Kockelman to Jonathan Segal, M.D., "for evaluation of depression."

Dr. Segal saw Kockelman for the first time on April 29, 1992. Kockelman described "a lifelong pattern" of chronic low-level depression, with more acute depressed periods, usually during the winter months. Dr. Segal's notes reveal that during the winter months, Kockelman's symptoms of sadness, pessimism, tension and anxiety became more aggravated and were "accompanied by thoughts of suicide, hopelessness, tremendous fatigue during which he cannot get out of bed for two or three days at a time, severe irritability and aggravation, decrease in concentration, trouble falling asleep and early morning awakening, social withdrawal, and spontaneous crying." Although these symptoms usually lessened in the springtime, in this year they had persisted. Kockelman brought with him to this appointment a handwritten summary of his symptoms on which was apparently noted at the bottom of a page: " 'Suicidal, frequently prayed to die.' " During the interview, however, Dr. Segal noted "no suggestion of psychosis, delusion or suicidality as such at this point."

Dr. Segal's initial diagnostic impression from this first visit was that Kockelman suffered from so-called " 'double depression,' " characterized by chronic low-level depression, punctuated by more severe periods of "true major depression." Kockelman had never taken antidepressants. Dr. Segal discussed in detail with him possible treatment with antidepressants and then prescribed the antidepressant desipramine in a small dosage, to be increased gradually every three days to 200 milligrams per day.

Kockelman saw Dr. Segal regularly on an outpatient basis over the next 17 months. In the first follow-up visit two weeks later, Kockelman reported some improvement, particularly in his sleep pattern, his energy level and his ability to get to work. However, he had also experienced moments of deep depression. Valerie Kockelman accompanied her husband to this appointment. Dr. Segal discussed with both of them a tendency of antidepressants to "overshoot the mark" in people who have hypomanic periods, and he warned them to watch for such symptoms.

At a visit in June of 1992, Kockelman had been taking desipramine at the 200-milligrams-per-day level and he and his wife reported "a very distinct improvement in his mood." However, it appeared he might be somewhat hyperactive. Dr. Segal recommended decreasing the dosage to 150 milligrams per day and told them to watch his mood and behavior carefully.

In July of 1992, Dr. Segal noted that Kockelman's mood was "about an 8 out of 10" as opposed to the "1 or 2 out of 10" he had reported prior to

starting antidepressant treatment. Dr. Segal had stabilized the dosage at 175 mg per day and Kockelman was reportedly feeling "very well."

As winter approached, Kockelman began feeling more depressed, anxious and lethargic. Dr. Segal increased his dosage of desipramine. In November, he noted that Kockelman was spending a number of days per week in bed and suffering from his full range of depressive symptoms. He recommended increasing the desipramine again, noting that Kockelman's metabolism might require a higher dosage. He also recommended that Kockelman try light therapy. He considered adding lithium as an adjuvant or switching to another antidepressant if no improvement was shown. At the end of November, the desipramine was increased to 350 milligrams per day and lithium was added to the regimen. In December, Kockelman reported "significant improvement" and was feeling "much better" and going to work every day.

In January of 1993, Dr. Segal's notes indicate that Kockelman lapsed into severe depression. The medications were again adjusted, with an increase in both the desipramine and the lithium. This produced some improvement during February and March. During these months, the doctor's notes reflect he suspected there was a psychodynamic overlay to Kockelman's pattern of depression. However, he reported that Kockelman was resistant to his suggestions that factors other than biological ones might be contributing to his depression. Kockelman declined to engage on any level other than a pharmacological one.

In April of 1993, Kockelman reported that he did not feel the medication was making a difference to his depression. Dr. Segal increased the desipramine for a short period of time and then lowered it in increments back down to 150 milligrams per day, through May and June. These months were relatively stable. However, in July, Kockelman reported the onset of acute depression once again. The desipramine dosage was increased to 200 milligrams without noted improvement. Dr. Segal found this "a bit surprising" since the summer months were usually a nondepressed time of year for Kockelman. Eventually, on August 6, 1993, he advised Kockelman to discontinue the desipramine and start taking Prozac. He was to come in for a follow-up visit after two weeks.

On August 19, 1993, Kockelman called Dr. Segal's office and reported he was too depressed to keep his appointment. Segal talked with both Kockelmans by phone. Valerie Kockelman told him that her husband was staying in bed most of the time and was perhaps more depressed than ever before. Dr. Segal thought there might be "some volitional element" involved. He talked at length with Valerie Kockelman about the treatment options, following

which he instructed that Kockelman increase his dosage of Prozac. If no improvement were shown, he advised that electroconvulsive therapy (ECT) was the next probable step, either on an inpatient or an outpatient basis.

Kockelman kept his appointment on September 2, 1993. He reported he was not doing much better, although he appeared neatly dressed and clean-shaven. Dr. Segal wrote that it was "mysterious" to him how Kockelman could rouse himself when needed and at other times could not get out of bed. But again he found it impossible to engage Kockelman in any psychody-namically oriented dialogue. He recommended increasing the Prozac dosage and restarting the lithium, but noted he did not feel "very optimistic" that this would make a difference. He discussed the possibility of ECT with Kockelman and noted he would see what could be arranged.

Kockelman died on September 5, 1993, three days after his last appoint-ment with Dr. Segal, from an overdose of desipramine. Valerie Kockelman stated that her husband was feeling more energetic and cheerful the last week before his death and had gone to work each day. She said "it was like he was a new person." They were planning a car trip to visit their daughter in Santa Rosa on the Saturday of a Labor Day weekend, and he was looking forward to it. On Saturday morning Kockelman told her he wanted to stay home and he urged her to go by herself. He did not seem depressed to her and appeared to be in good spirits. He told her he just wanted to "rest up." She left Saturday and when she returned home the following evening she discovered her husband's body.

## CASE HISTORY

On September 2, 1994, Valerie Kockelman, in propria persona, filed a complaint for the wrongful death of William Kockelman, alleging that her husband's death was caused by the professional negligence of Dr. Segal and the Palo Alto Medical Foundation.

Defendants filed this motion for summary judgment on March 18, 1996. Their supporting papers included Dr. Segal's charts and other notes from the Clinic and excerpts from the deposition of Valerie Kockelman. The motion was based on the assertion that California law does not impose a duty on a psychiatrist to prevent the suicide of an outpatient. The matter was set for hearing June 13, 1996.

On the day of the hearing Valerie Kockelman appeared and submitted a packet of papers in opposition. These included a statement in which she argued that Segal and the Clinic had a duty to use due care in the treatment

of her husband, a letter from a Palo Alto psychiatrist, Dr. Brent Wenegrat, stating his opinion that the treatment of Kockelman fell below acceptable standards of care, and further records from the Clinic, which had not been included in defendants' moving papers. The court took the matter under submission and granted defendants' motion June 24, 1996, without stating any reasons.

On July 10, 1996, plaintiff, now represented by counsel, filed a motion for reconsideration. Counsel argued that the court did not have before it all the relevant facts and law at the previous hearing. The court denied the motion for reconsideration October 22, 1996. Notice of the entry of the judgment was served on December 5, 1996. Valerie Kockelman filed this appeal from the judgment January 17, 1997.

## LEGAL ANALYSIS

Defendants' summary judgment was based upon the single claim that as a matter of law a psychiatrist owes no duty of care to an outpatient who may be suicidal. ■ Whether an individual owes a duty of care to another is a question of law, to be decided by the court. (*Bily* v. *Arthur Young & Co.* (1992) 3 Cal.4th 370, 397 [11 Cal.Rptr.2d 51, 834 P.2d 745, 48 A.L.R.5th 835]; *Ballard* v. *Uribe* (1986) 41 Cal.3d 564, 572, fn. 6 [224 Cal.Rptr. 664, 715 P.2d 624]; *Portillo* v. *Aiassa* (1994) 27 Cal.App.4th 1128, 1133 [32 Cal.Rptr.2d 755].) The court's task "is not to decide whether a *particular* plaintiff's injury was reasonably foreseeable in light of a *particular* defendant's conduct, but rather to evaluate more generally whether the category of negligent conduct at issue is sufficiently likely to result in the kind of harm experienced that liability may appropriately be imposed on the negligent party." (*Ballard* v. *Uribe, supra,* 41 Cal.3d at p. 572, fn. 6; *Perez* v. *Van Groningen & Sons, Inc.* (1986) 41 Cal.3d 962, 971 [227 Cal.Rptr. 106, 719 P.2d 676]; *Weirum* v. *RKO General, Inc.* (1975) 15 Cal.3d 40, 46 [123 Cal.Rptr. 468, 539 P.2d 36].) The existence of a duty of care is a separate issue from the question whether (on the basis of foreseeability among other factors) a particular defendant breached that duty of care, which is an essentially factual matter. (Cf. *Ballard* v. *Uribe, supra,* 41 Cal.3d at p. 572, fn. 6; *Perez* v. *Van Groningen & Sons, Inc., supra,* 41 Cal.3d at p. 971; *Weirum* v. *RKO General, Inc., supra,* 15 Cal.3d 40, 46.)

■ Under traditional tort law principles, a person is not ordinarily liable for the actions of another and is under no duty to protect another person from harm. (*Nally* v. *Grace Community Church* (1988) 47 Cal.3d 278, 293 [253 Cal.Rptr. 97, 763 P.2d 948].) An affirmative duty to protect another from

harm may arise, however, where a "special relationship" exists. (*Williams* v. *State of California* (1983) 34 Cal.3d 18, 23 [192 Cal.Rptr. 233, 664 P.2d 137]; *Weirum* v. *RKO General, Inc., supra,* 15 Cal.3d 40, 48; *Clarke* v. *Hoek* (1985) 174 Cal.App.3d 208, 215-216 [219 Cal.Rptr. 845].) Such a special relationship is typically where the plaintiff is particularly vulnerable and dependent upon the defendant who, correspondingly, has some control over the plaintiff's welfare. (Prosser & Keeton, Torts (5th ed. 1984) § 56, p. 374.) "[T]he relationship between a therapist and his patient satisfies this requirement . . . ." *(Tarasoff* v. *Regents of University of California* (1976) 17 Cal.3d 425, 435 [131 Cal.Rptr. 14, 551 P.2d 334, 83 A.L.R.3d 1166]; see also *Gross* v. *Allen* (1994) 22 Cal.App.4th 354, 362 [27 Cal.Rptr.2d 429]; *Hedlund* v. *Superior Court* (1983) 34 Cal.3d 695, 700 [194 Cal.Rptr. 805, 669 P.2d 41, 41 A.L.R.4th 1063] [". . . a psychotherapist stands in a special relationship with a person whose conduct may need to be controlled—the patient . . . ."]; *Waters* v. *Bourhis* (1985) 40 Cal.3d 424, 434 [220 Cal.Rptr. 666, 709 P.2d 469] [referring to ". . . the special duty that a psychiatrist owes to his patient to use due care for the patient's health in the conduct of the therapist-patient relationship"]; *Richard H.* v. *Larry D.* (1988) 198 Cal.App.3d 591, 596 [243 Cal.Rptr. 807].)

The parameters of the doctor's duty of care and the adequacy of the diagnosis and treatment of the particular patient under particular circumstances will necessarily vary with the facts, measured against professional standards of reasonableness. *(Tarasoff* v. *Regents of University of California, supra,* 17 Cal.3d at p. 439.) These determinations will require expert testimony and are beyond the scope of this summary judgment motion. Indeed defendants included no expert opinion in their moving papers, instead taking the position that there was no duty in this case because Kockelman was not hospitalized.

█ Our standard of review in such a case is clear. The existence of a duty, sufficient to impose liability in a negligence claim, is a question of law, which we review de novo. *(Ann M.* v. *Pacific Plaza Shopping Center* (1993) 6 Cal.4th 666, 674 [25 Cal.Rptr.2d 137, 863 P.2d 207].)

The duty of a doctor towards a potentially suicidal patient was first discussed by the Supreme Court in the early case of *Wood* v. *Samaritan Institution* (1945) 26 Cal.2d 847 [161 P.2d 556]. In *Wood,* the plaintiff injured herself when she jumped through a second floor window of a sanitarium where she was undergoing care and treatment for chronic alcoholism.

The court observed that a hospital owes its patients a duty of protection and must exercise such reasonable care as the patient's known condition might require. (*Id.* at pp. 852-853.) Here plaintiff had put forth evidence showing that she was in a condition from which a reasonable professional person could conclude that she might do harm to herself unless restrained, and that such condition was known to and recognized by the hospital staff. The court noted that the extent and character of the duty of care owed depended on the circumstances of each case and was therefore a factual rather than a legal issue. Thus it could not be said as a matter of law that plaintiff failed to establish a prima facie showing of negligence against the hospital. The court therefore reversed a nonsuit judgment against plaintiff. (*Ibid.*)

*Vistica* v. *Presbyterian Hospital* (1967) 67 Cal.2d 465 [62 Cal.Rptr. 577, 432 P.2d 193] was a wrongful death action brought by the heirs of a woman who committed suicide in the psychiatric ward of a hospital. The decedent was known to have strong suicidal tendencies and the hospital staff was on notice to take suicide precautions. On one occasion in the hospital she was found to have piled up furniture in order to reach an open third story window. The next day, although her doctor had ordered 24-hour surveillance for her, she again piled up furniture under the same window and jumped to her death. A jury returned a verdict in favor of the hospital.

The Supreme Court reversed, finding that the trial court had erroneously instructed the jurors regarding the res ipsa loquitur doctrine. ■ The court explained that the duty imposed on the hospital was to "exercise such reasonable care toward a patient as his [or her] mental and physical condition, if known, require; the duty extends to safeguarding the patient from dangers due to mental incapacity; and where the hospital has notice or knowledge of facts from which it might reasonably be concluded that a patient would be likely to harm himself [or herself] or others unless preclusive measures were taken, then the hospital must use reasonable care in the circumstances to prevent such harm." (*Vistica* v. *Presbyterian Hospital,* *supra,* 67 Cal.2d at p. 469, citing *Wood* v. *Samaritan Institution, supra,* 26 Cal.2d at p. 851.) The court concluded that, based upon the facts of the case, the jury could draw the inference that it was more probable than not that decedent's death was caused by the hospital's breach of its duty of care to protect her from her own actions, whether voluntary or involuntary.

These principles were further elucidated by the high court in *Meier* v. *Ross General Hospital* (1968) 69 Cal.2d 420 [71 Cal.Rptr. 903, 445 P.2d 519]. Like *Vistica,* *Meier* was a wrongful death action involving the suicide of a mental patient while confined in the psychiatric ward of a hospital. Also like *Vistica,* the case involved the propriety of a jury instruction on the res ipsa

loquitur doctrine in a case where the decedent's voluntary actions contributed to his death. The court found that the trial judge had erroneously rejected an instruction that plaintiffs were entitled to the benefit of the res ipsa loquitur presumption even though the decedent participated in events leading to his death. The court reiterated the general rule from its previous holdings, that "those charged with the care and treatment of a patient, who know of facts from which it might reasonably be concluded that a patient would be likely to harm himself [or herself] in the absence of preclusive measures, must use reasonable care to prevent such harm." (*Meier* v. *Ross General Hospital, supra,* 69 Cal.2d at p. 427; see also *Klein* v. *BIA Hotel Corp.* (1996) 41 Cal.App.4th 1133, 1142 [49 Cal.Rptr.2d 60].) Given this duty and the facts in *Meier* that the decedent had previously attempted suicide and that thereafter hospital staff had placed him unattended in a second floor room with an unsecured and fully openable window, the jury could find that defendants more probably than not breached the duty of care owed to decedent.

Defendants in our case point out that *Wood, Vistica,* and *Meier* all involved circumstances where the patient was confined in a hospital. They argue that no California case has extended the duty of care described in *Meier* to psychiatrists whose patients are not hospitalized; thus no such duty exists. We do not find this argument persuasive. As we explain below, we believe California courts have recognized that psychiatrists owe a duty of care, consistent with standards in the professional community, to provide appropriate treatment for potentially suicidal patients, whether the patient is hospitalized or not. There is no reasonable basis for the distinction defendants seek to impose. Indeed, it would seem almost self-evident that doctors must use reasonable care with *all* of their patients in diagnosing suicidal intent and implementing treatment plans.

Both plaintiff and defendants argue that *Bellah* v. *Greenson* (1978) 81 Cal.App.3d 614 [146 Cal.Rptr. 535, 17 A.L.R.4th 1118] and *Nally* v. *Grace Community Church, supra,* 47 Cal.3d 278 support their respective points of view. In *Bellah,* parents brought a wrongful death action against a psychiatrist who had been treating their daughter on an outpatient basis. They alleged that defendant had failed to take measures to prevent their daughter's suicide, and had failed to warn them of circumstances which might cause her to take her own life. The trial court sustained defendant's demurrer on two grounds: that no cause of action was stated and that the complaint, filed two years after the death, was barred by the statute of limitations.

The court first addressed the question whether the allegations were sufficient to state a cause of action for negligence. Citing *Vistica* and *Meier,* the

court stated that ". . . the requisite special relationship does exist in the case of a patient under the care of a psychiatrist" and that ". . . a psychiatrist who knows that his patient is likely to attempt suicide has a duty to take preventive measures." (*Bellah* v. *Greenson, supra,* 81 Cal.App.3d at p. 619) The court then distinguished *Vistica* and *Meier* on their facts, observing that "the duty imposed upon those responsible for the care of a patient in an institutional setting differs from that which may be involved in the case of a psychiatrist treating patients on an out-patient basis." (*Id.* at p. 620.) However, the court concluded that the complaint before it "alleged the existence of a psychiatrist-patient relationship between defendant and [the daughter], knowledge on the part of the defendant that [the daughter] was likely to attempt suicide, and a failure by defendant to take appropriate preventive measures." (*Ibid.*) According to the court in *Bellah*, ". . . these allegations are sufficient to state a cause of action for the breach of a psychiatrist's duty of care towards his patient." (*Bellah* v. *Greenson, supra,* 81 Cal.App.3d at p. 620; see also *Gross* v. *Allen, supra,* 22 Cal.App.4th 354, 362; *Jacoves* v. *United Merchandising Corp.* (1992) 9 Cal.App.4th 88, 106 [11 Cal.Rptr.2d 468] ["In *Bellah* . . . , the appellate court applied the long-established duty of care that doctors owe to patients to psychiatrists who treat patients on an outpatient basis. . . ."].)

Although finding a duty of care running from the psychiatrist to the patient, the court in *Bellah* rejected the plaintiffs' argument that the psychiatrist had a duty to the parents to reveal to them disclosures made by their daughter in the course of the therapy about conditions which might cause her to commit suicide. In *Tarasoff* v. *Regents of University of California, supra,* 17 Cal.3d 425, the court held that a therapist's duty does not require the disclosure of such confidences "unless such disclosure is necessary to avert danger to others." (*Id.* at p. 441) The court in *Bellah* declined to extend the holding in *Tarasoff* to impose a duty on a therapist to inform third persons where the risk of harm is self-inflicted harm rather than the danger of violent assault upon others. The court then addressed the second ground for the demurrer in *Bellah* and affirmed the judgment of dismissal on the ground that the action was barred by the applicable statute of limitations for professional negligence contained in Code of Civil Procedure section 340.5.

■ Ten years after the *Bellah* decision, the Supreme Court revisited the duty issue in *Nally* v. *Grace Community Church, supra,* 47 Cal.3d 278. In *Nally*, parents filed a wrongful death action against Grace Community Church and four pastors of the church, alleging that defendants had been negligent in failing to take steps to prevent the suicide of plaintiffs' son, who received counseling in the church's pastoral counseling program prior to his death. The court addressed the question whether a duty should be imposed

on "nontherapist counselors," i.e., persons other than licensed psychotherapists who counsel others concerning their emotional and spiritual problems, to take affirmative steps, such as referring the person to professional help, once it appears suicide is a foreseeable risk. The court answered the question in the negative and thus affirmed the trial court's judgment of dismissal on the basis that defendants had no duty on which to base liability for the death of plaintiffs' son.

 The court reasoned that the imposition of a duty such as that found in *Vistica* and *Meier* should be carefully limited, and it declined to extend such a duty of care to personal or religious counseling relationships, where the person providing guidance was a nonprofessional counselor who had no control over the environment of the individual being counseled. The court discussed *Bellah* at some length. It observed that in *Bellah* the court had simply recognized that a traditional medical malpractice cause of action may exist for the breach of a psychiatrist's duty of care to his patient, and that "this duty may be imposed on the treating psychiatrist even though his patient committed suicide outside the confines of a hospital." (*Nally* v. *Grace Community Church, supra*, 47 Cal.3d at pp. 294-295.) The court emphasized, however, that *Bellah* did not create any broad duty to refer on the part of nonprofessional counselors. Furthermore, the court characterized the discussion of duty in *Bellah* as dictum, since the judgment had been affirmed on the basis of the statute of limitations. The *Nally* court summarized its conclusions regarding *Bellah* as follows: "Rather than create a duty to prevent suicide, *Bellah* (and *Meier* and *Vistica*) recognized that a cause of action may exist for *professional malpractice* when a psychiatrist's (or hospital's) treatment of a suicidal patient falls below the standard of care for the profession, thus giving rise to a traditional malpractice action." (*Nally* v. *Grace Community Church, supra*, 47 Cal.3d at pp. 295-296, original italics.)

Defendants point out that the court in *Nally*, in a footnote, rejected a rule which would impose an affirmative duty on a psychiatrist to see that his patient does no harm to himself. "If such were the case," the court commented, "psychiatrists could be held responsible whenever one of their patients made the unfortunate decision to take his own life." (*Nally* v. *Grace Community Church, supra*, 47 Cal.3d at p. 296, fn. 6.) We note that this statement was a response to the dissenter's characterization of the holding in *Bellah*, and is therefore dictum. Furthermore, we do not by any means purport to endorse a rule which imposes an absolute duty on a psychiatrist to prevent a patient's suicide. We find only that a psychiatrist's duty of care to a patient, which may include taking appropriate suicide prevention measures if warranted by all of the circumstances, is not negated by the patient's status as an outpatient.

A close reading of *Nally* and *Bellah* reveals that those cases do not hold otherwise. The sole question addressed by *Nally* was whether nonprofessional counselors should be under a duty of care similar to licensed medical professionals. Rejecting plaintiffs' cause of action for "clergyman malpractice," the court concluded as follows: "Plaintiffs failed to persuade us that the duty to prevent suicide (heretofore imposed only on psychiatrists and hospitals while caring for a suicidal patient) or the general professional duty of care (heretofore imposed only on psychiatrists when treating a mentally disturbed patient) should be extended to a nontherapist counselor who offers counseling to a potentially suicidal person on secular or spiritual matters." (*Nally* v. *Grace Community Church*, *supra*, 47 Cal.3d at pp. 283, 299-300.) In our view this conclusion reflects the court's recognition that such a duty does exist between psychiatrists and their patients. The court did not hold or imply that the existence of a duty depended on whether the patient was being treated in a hospital setting or as an outpatient. *Bellah* did note a distinction between outpatients and those confined in a hospital. However, the court did not conclude that there was *no duty* owed to an outpatient, but simply that the scope of the duty imposed on those responsible for the patient's care would differ depending on the setting.

*Katona* v. *County of Los Angeles* (1985) 172 Cal.App.3d 53 [218 Cal.Rptr. 19] does not support the granting of the summary judgment motion here. In that case the decedent committed suicide six weeks after she had been discharged from a mental health facility. Her parents filed suit against the mental health facility and the gun dealer who sold their daughter the gun with which she took her life. The court found that while the hospital had a duty to protect decedent while she was in their care, ". . . there is no justification for extending that duty beyond the patient's unconditional release." (*Id.* at p. 59.) Although the court found no duty in *Katona*, it was not because the decedent was an outpatient, but rather because she had been unconditionally discharged and was not engaged in a psychotherapist-patient relationship at all.

*Jacoves* v. *United Merchandising Corp.*, *supra*, 9 Cal.App.4th 88 also involved a wrongful death case where the patient committed suicide after he had been discharged from a psychiatric hospital. In bringing a summary judgment motion, the hospital contended it had no duty to the patient after he was discharged. However, in *Jacoves* the special relationship lacking in *Katona* was present, since both the patient's psychologist and his psychiatrist, who had admitted him and later discharged him from the hospital, continued to see him as an outpatient after he was released to his parents'

care. The Court of Appeal reversed the grant of summary judgment, finding there were triable factual issues both as to the question whether the psychiatrist was acting as an agent of the hospital and the question whether the hospital, through its agent, exercised reasonable care under the circumstances. Citing *Bellah*, the court found that under prevailing California law the complaint had stated a cause of action for wrongful death based on professional malpractice, by alleging that a psychiatrist's, or hospital's, treatment of a suicidal patient fell below the standard of care for the profession. (*Jacoves* v. *United Merchandising Corp.*, *supra*, 9 Cal.App.4th at p. 106.) "In diagnosing and treating patients," the court stated, "doctors must exercise the reasonable degree of skill, knowledge and care ordinarily exercised by doctors under similar circumstances in their professional community." (*Id.* at p. 105.)

In sum, we have found no precedent supporting the defendants' position that a licensed professional psychotherapist owes no duty of care to a potentially suicidal patient solely because the patient is seen on an outpatient basis rather than confined in a hospital. Existing case law provides that a psychotherapist or other mental health care provider has a duty to use a reasonable degree of skill, knowledge and care in treating a patient, commensurate with that possessed and exercised by others practicing within that specialty in the professional community. (*Meier* v. *Ross General Hospital*, *supra*, 69 Cal.2d 420, 424; *Bellah* v. *Greenson, supra,* 81 Cal.App.3d 614, 620; *Jacoves* v. *United Merchandising Corp.*, *supra*, 9 Cal.App.4th at p. 106.) "If those who are caring for and treating mentally disturbed patients know of facts from which they could reasonably conclude that the patient would be likely to self-inflict harm in the absence of preventative measures, then those caretakers must use reasonable care under the circumstances to prevent such harm from occurring." (9 Cal.App.4th at p. 105; *Gross* v. *Allen, supra,* 22 Cal.App.4th at p. 362; *Nally* v. *Grace Community Church, supra,* 47 Cal.3d at pp. 294-295; *Vistica* v. *Presbyterian Hospital, supra,* 67 Cal.2d 465.) This duty exists whether the patient is hospitalized at the time or not.

Whether Dr. Segal acted within the duty of care in the circumstances of this case involves factual determinations which must be resolved by the opinions and specialized knowledge of experts in the field. We do not presume to predict the outcome of these determinations, or the resolution of the further question whether, even if Dr. Segal's care fell below prevailing standards, that was a proximate cause of Kockelman's death. We find only that the trial court erred in ruling that Kockelman's status as an outpatient decided the issue of duty as a matter of law.

## DISPOSITION

The judgment entered following the court's granting of defendants' motion for summary judgment is reversed. Appellant shall recover costs on appeal.

Cottle, P. J., and Mihara, J., concurred.