IN THE SUPREME COURT OF APPEALS OF WEST VIRGINIA

September 2021 Term

_____

No. 20-0750

_____

FILED
November 16, 2021
released at 3:00 p.m.
EDYTHE NASH GAISER, CLERK
SUPREME COURT OF APPEALS
OF WEST VIRGINIA

CHRISTOPHER MORRIS, individually and as
Administrator of the Estate of Amy Christine Wade,
Plaintiff Below, Petitioner

v.

STEVEN CORDER, M. D., MELANIE BASSA, M. A.,
MARTHA DONAHUE, N. P., NORTHWOOD HEALTH SYSTEMS, INC.,
MID-VALLEY HEALTHCARE SYSTEMS, INC., and JOHN DOES 1-5,
Defendants Below, Respondents

_____

Appeal from the Circuit Court of Ohio County, West Virginia
The Honorable David J. Sims, Judge
Civil Action No. 20-C-140

REVERSED AND REMANDED

_____

Submitted:  October 6, 2021
Filed:  November 16, 2021

Benjamin L. Bailey, Esq.
BAILEY GLASSER, LLP
Charleston, West Virginia
P. Gregory Haddad, Esq.
Travis A. Prince, Esq.
BAILEY GLASSER, LLP
Morgantown, West Virginia
Counsel for Petitioner

Roberta F. Green, Esq.
Justin M. Kearns, Esq.
Shuman McCuskey Slicer PLLC
Charleston, West Virginia
Counsel for Respondent
Steven Corder, M. D.

Cy A. Hill, Jr., Esq.
Ashley W. French, Esq.
Cipriani & Werner, P. C.
Charleston, West Virginia
Counsel for Respondent
Melanie Bassa, M. A.

Patrick S. Casey, Esq.
Sandra M. Chapman, Esq.
CASEY & CHAPMAN, PLLC
Wheeling, West Virginia
Counsel for Respondents Martha Donahue,
N. P., Northwood Health Systems, Inc., and
Mid-Valley Healthcare Systems, Inc.

JUSTICE WOOTON delivered the Opinion of the Court.
CHIEF JUSTICE JENKINS and JUSTICE ARMSTEAD dissent and reserve the right to file dissenting opinions.

SYLLABUS BY THE COURT

1.      "Appellate review of a circuit court's order granting a motion to dismiss a complaint is *de novo*."  Syl. Pt. 2, *State ex rel. McGraw v. Scott Runyan Pontiac-Buick, Inc.*, 194 W. Va. 770, 461 S.E.2d 516 (1995).


2.      "Recovery for wrongful death by suicide may be possible where the defendant had a duty to prevent the suicide from occurring. In order to recover, the plaintiff must show the existence of some relationship between the defendant(s) and the decedent giving rise to a duty to prevent the decedent from committing suicide. Generally, such relationship exists if one of the parties, knowing the other is suicidal, is placed in the superior position of caretaker of the other who depends upon that caretaker either entirely or with respect to a particular matter."  Syl. Pt. 6, *Moats v. Preston Cnty. Comm'n*, 206 W. Va. 8, 521 S.E.2d 180 (1999).

WOOTON, J.:

This is an appeal from the Circuit Court of Ohio County's August 26, 2020, order dismissing the claim of petitioner Christopher Morris, individually and as Administrator of the Estate of Amy Christine Wade (hereinafter "petitioner") against respondents Steven Corder, M. D., Melanie Bassa, M. A., Martha Donahue, N. P., Northwood Health Systems, Inc., Mid-Valley Healthcare Systems, Inc., and John Does 1-5 (hereinafter collectively "respondents") pursuant to Rule 12(b)(6) of the West Virginia Rules of Civil Procedure. The circuit court found that petitioner's claims for medical negligence are barred by his failure to allege that his decedent was "in the custody" of respondents at the time of her suicide.

After careful review of the briefs of the parties, their oral arguments, the appendix record, and the applicable law, we find that the circuit court erred in concluding that this Court's precedent requires a decedent to be in the "custody" of a health care provider to assert a claim for deviations from the standard of care proximately resulting in a decedent's suicide. Accordingly, we reverse the circuit court's dismissal of the case and remand for further proceedings.

## I. FACTS AND PROCEDURAL HISTORY

In his complaint, petitioner alleges that his decedent, Amy Christine Wade (hereinafter "Ms. Wade"), received behavioral and mental health treatment from

1

respondents for more than ten years, from January 1, 2008 through June 2018. She was diagnosed with paranoid schizophrenia, borderline mental functioning, and panic disorder agoraphobia and treated with a combination of pharmaceuticals, clinical management, and counseling by respondents.

Petitioner alleges that on or around February 28, 2018, Ms. Wade's psychiatric condition began to rapidly deteriorate. Treatment notes thereafter allegedly reflect an increase in suicidal thoughts, auditory hallucinations, threatening visual hallucinations, and general emotional instability. On April 25, 2018, Ms. Wade allegedly made irrational claims about the death of her grandson and reported increased sadness, crying spells, decreased sleep, and increased worrying. On June 11, 2018, Ms. Wade's providers noted that she had a disheveled appearance, reported that she "doesn't sleep anymore," that her "life has been hell," and that she had three suicidal ideations in the week prior. On June 20, 2018, Ms. Wade reported that she had been in "such a state of panic" that she presented for treatment at an Emergency Room. Ms. Wade committed suicide on June 30, 2018.

Petitioner served a notice of claim and screening certificate of merit on each respondent pursuant to the Medical Professional Liability Act, West Virginia Code §§ 55-7B-1 through -12 (2015 & Supp. 2021)) ("MPLA") and filed his complaint alleging that the individual respondents deviated from the standard of care in their treatment of Ms.

Wade.[1]  More specifically, petitioner alleges that despite Ms. Wade's increasingly unstable presentation and reports of suicidal ideation, no changes were made to her treatment regimen—including medications, follow-up appointments, and specialist evaluations—nor was she referred for hospitalization in a crisis stabilization unit or admission to an inpatient psychiatric unit.

In response to the complaint, all respondents filed motions to dismiss pursuant to Rule 12(b)(6) of the West Virginia Rules of Civil Procedure, arguing that Ms. Wade's suicide constituted an intentional intervening act and precluded liability against respondents.  In evaluating the allegations in the complaint, the circuit court highlighted that "[a]t no time was [Ms. Wade] in the voluntary or involuntary custody of any of the Defendants during the relevant time frame[] . . . [and that] all services were rendered on an out-patient basis."  Citing this Court's decision in *Moats v. Preston County Commission*, 206 W. Va. 8, 521 S.E.2d 180 (1999) and a subsequent memorandum decision, the circuit court found petitioner's failure to allege that respondents were "custodial caretaker[s]"— which the court perceived to constitute the "one exception to the general bar on suicide claims"—was fatal to her cause of action.  The circuit court dismissed the complaint

---

[1] The claims against Mid-Valley, Northwood, and John Does 1-5 were characterized as vicarious liability claims as the "employer and/or principal(s)" of the individually named respondents.

pursuant to Rule 12(b)(6) due to the complaint's "fail[ure] to allege that [Ms. Wade] was in the custody of any [respondent] at the time of her suicide." This appeal followed.

## II. STANDARD OF REVIEW

"Appellate review of a circuit court's order granting a motion to dismiss a complaint is *de novo*." Syl. Pt. 2, *State ex rel. McGraw v. Scott Runyan Pontiac-Buick, Inc.*, 194 W. Va. 770, 461 S.E.2d 516 (1995). With this standard in mind, we proceed to the parties' arguments.

## III. DISCUSSION

Although petitioner asserts three separate assignments of error,[2] this case presents a relatively narrow issue of law regarding the scope of this Court's holding in *Moats*. The question presented is whether this Court's precedent holds that a negligence-based claim for professional liability for failure to prevent suicide is restricted to only those defendants who had a "custodial" relationship with the decedent. Petitioner argues that the circuit court misread *Moats* and that nothing in our caselaw limits a cause of action for failure to prevent suicide to only "custodial caretakers." He argues further that such a reading of our precedent would effectively void any duty of care to outpatient mental health

---

[2] Petitioner asserts that the circuit court erred 1) by finding no "special relationship" leading to a duty to prevent suicide; 2) by finding that health care providers of suicidal outpatients have no duty of ordinary care; and 3) by applying *Moats* in a manner which violates the equal protection clause of the West Virginia Constitution. Because the circuit court simply erred in its reading of our precedent, we find it unnecessary to resolve the case in the manner characterized by these assignments of error.

4

patients, thereby nullifying the requirement of the MPLA that health care providers conform to the applicable standard of care. Respondents argue that it is petitioner who seeks to expand the law of this state as it pertains to "non-custodial suicide." Respondents urge that such an expansion is unsound from a public policy standpoint and vitiates the Court's long-standing treatment of suicide as an intervening cause barring liability.

We begin with an examination of *Moats*. In *Moats*, plaintiff's decedent was involuntarily committed to the custody of the Preston County Sheriff's Office for transfer to William Sharpe Hospital for a mental health evaluation, having attempted suicide the day prior. 206 W. Va. at 11, 521 S.E.2d at 183. While at the Preston County Jail office awaiting transfer, the decedent consumed bathroom cleaner which resulted in her death eight months later. *Id*. Charles A. Moats, on behalf of the decedent's estate, brought a wrongful death action against the county commission and a mental health evaluator, who testified in the decedent's mental hygiene hearing and left her in the jail office while he went to retrieve her commitment order. *Id*.

In one of several certified questions to this Court, the circuit court queried whether the fact that the decedent committed suicide was an outright bar to Moats' claims. *Id.* The Court began by recognizing that despite the fact that suicide has "generally" been treated as an intervening cause, "courts have allowed such actions where the defendant is found to have actually caused the suicide or where the defendant is found to have had a duty to prevent the suicide from occurring." *Id*. at 16, 521 S.E.2d at 188. Elaborating on

5

the duty exception, the Court observed again that "generally" the exception applies where there is a "duty of custodial care" and the defendant knows that the potential for suicide exists but fails to take preventative measures. *Id.* Pertinent to the particular facts in *Moats*, the Court further noted that this exception had been applied to "jails, hospitals, reform schools, and others having actual physical custody and control over such persons." *Id.* This discussion forms the centerpiece of the circuit court and respondents' insistence that only "custodial" suicide is actionable.

Importantly, however, the foregoing discussion from *Moats* is merely dicta. In answering the certified question, the *Moats* Court held as follows in a properly issued syllabus point:

> Recovery for wrongful death by suicide may be possible where the defendant had a duty to prevent the suicide from occurring. In order to recover, the plaintiff must show the existence of *some relationship* between the defendant(s) and the decedent giving rise to a duty to prevent the decedent from committing suicide. *Generally*, such relationship exists if one of the parties, knowing the other is suicidal, is placed in the superior position of *caretaker* of the other who depends upon that caretaker either entirely or with respect to a particular matter.

206 W. Va. 8, 521 S.E.2d 180, syl. pt. 6 (emphasis added). Notably absent from the Court's syllabus point is any reference to a "custodial" relationship, be it as a caretaker or otherwise. Rather, the syllabus point expressly requires only "*some* relationship" which would give rise to a duty to prevent suicide. *Id.* (emphasis added). Further, the syllabus point's elaboration on the type of "caretak[ing]" which would exemplify such relationship

6

certainly does not preclude non-custodial "caretaker[s]"; rather it describes somewhat broadly the *degree* of caretaking required, without reference to the setting or construct. Therefore, the circuit court's conclusion that *Moats* holds that a custodial relationship is required to advance a duty-based (as opposed to causation-based) suicide claim is in error.[3]

Respondents insist that the *Moats* Court intended to exclusively sanction custodial negligence as an actionable form of "failure to prevent" suicide claim. However, it is the breadth of the syllabus point's language—in the face of specifically delineated instances of liability and/or other criteria which it easily could have adopted—which best demonstrates *Moats'* resistance to being construed as narrowly as respondents would urge. Importantly, *Moats'* discussion of the types of duty-based causes of action for failure to prevent suicide was plainly not intended to be comprehensive. The suicide at issue in

---

[3] In fairness to the circuit court and respondents, however, their collective belief that a custodial requirement was implicitly adopted in *Moats* was somewhat perpetuated by references to "custodial care" in a recent memorandum decision. *See Hull v. Nasher-Alneam*, No. 18-1028, 2020 WL 882087, at *3 (W. Va. Feb. 24, 2020) (memorandum decision), *cert. denied*, No. 20-1818, 2021 WL 4507880 (U.S. Oct. 4, 2021). Largely tracking the elements highlighted by the lower court in that case, the *Hull* Court agreed that the allegations in the complaint lacked the element of custody, but also emphasized the absence of *any* physician-patient relationship for greater than one year with the defendants, who were not mental health professionals, but rather orthopedists. *Id*.

Regardless, the memorandum decision in *Hull* was incapable of creating a previously non-existent requirement of "custody" for duty-based suicide claims. *See* Syl. Pt. 1, in part, *State v. McKinley*, 234 W. Va. 143, 764 S.E.2d 303 (2014) ("[T]he Court uses original syllabus points to announce new points of law[.]"). Further, while precedential, memorandum decisions are "necessarily more limited" and "where a conflict exists between a published opinion and a memorandum decision, the published opinion controls." *Id.*, syl. pt. 5.

*Moats* occurred while the decedent was *in custody* in a jail office while awaiting transport to a secure facility. Accordingly, as preface to its holding, *Moats* discusses certain *custodial*, duty-based scenarios in which liability has been imposed: "[T]his exception has been applied to jails, hospitals, reform schools, and others having actual physical custody and control over such persons." *Id*. at 16, 521 S.E.2d at 188.

This discussion is directly derived from an outline of duty-based "failure to prevent" suicide scenarios described in *McLaughlin v. Sullivan*, 461 A.2d 123, 125 (N. H. 1983). Presumably because it was not germane to the factual scenario presented in *Moats*, the Court did not include the *McLaughlin* court's discussion of a *second* type of defendant with whom a duty to prevent suicide may lie: mental health professionals. The remainder of the excerpt from *McLaughlin* elaborates:

> Specifically, this duty has been imposed on: . . . (2) persons or institutions such as mental hospitals, psychiatrists and other mental-health trained professionals, deemed to have a special training and expertise enabling them to detect mental illness and/or the potential for suicide, and which have the power or control necessary to prevent that suicide.

*Id.* There is no reference to "custody" contained within the description of this category of defendant.

It is significant that the syllabus point issued in *Moats* did not attempt to strictly limit liability to either of the specific categories described in *McLaughlin* by utilizing the wording or characterizations contained therein. Instead, the original language

8

of the syllabus point appears aimed at broadly synthesizing these two categories of duty-based suicide claims, while allowing for additional unspecified scenarios which fulfill the relationship criterion and thereby justify an imposition of a duty. The syllabus point draws its focus to the degree of the caretaking relationship and the caretaker's knowledge that the individual is "suicidal" for purposes of imposition of duty. Accordingly, the syllabus point is crafted to be applicable to a broad range of scenarios both fairly encompassing those specifically described in *McLaughlin,* as well as those that fall outside of its contemplation but nonetheless factually give rise to an actionable duty.

Our conclusion that the circuit court misread the decision in *Moats* is not only consistent with this Court's stated syllabus point, but also consistent with the type of claims previously found actionable here and elsewhere. *See Martin v. Smith*, 190 W. Va. 286, 438 S.E.2d 318 (1993) (upholding verdict against psychiatrist where decedent committed suicide after being released from facility on eight-hour pass); *Rodriguez-Escobar v. Goss*, 392 S.W.3d 109, 113 (Tex. 2013) (permitting action against psychiatrist for failure to prevent suicide where "suicide probably would not have occurred if the decedent had been hospitalized."); *Perez v. United States,* 883 F. Supp. 2d 1257, 1286 (S.D. Fla. 2012) ("[I]t would be peculiar, and seemingly contrary to the intent of Florida's law on medical negligence, to absolve a treating psychiatrist of liability for all negligent acts simply because the patient is being seen on an outpatient basis." (footnote omitted)); *Peterson v. Reeves*, 727 S.E.2d 171 (Ga. Ct. App. 2012) (recognizing psychiatrist's failure to involuntarily commit patient may form basis of malpractice action); *Kockelman v. Segal*,

71 Cal. Rptr. 2d 552, 561 (Cal. Ct. App. 1998) (holding psychiatrist's duty of care "exists whether the patient is hospitalized at the time or not"); *Edwards v. Tardif*, 692 A.2d 1266, 1270 n.7 (Conn. 1997) (rejecting argument that psychiatrist liability for suicide is limited to "when patient is in the physician's custody").[4]

Moreover, our interpretation of *Moats* is consonant with sound public policy and common sense. Importantly, petitioner herein alleges that respondents deviated from the applicable standard of care by, inter alia, failing to admit Ms. Wade to a crisis stabilization facility or in-patient psychiatric facility. It would defy logic to permit a health care provider to evade liability for failing to properly admit a patient on the basis that the patient *was not admitted*. *Compare Bexiga v. Havir Mfg. Corp.*, 290 A.2d 281, 286 (N. J. 1972) (concluding it would be "anomalous to hold that defendant has a duty . . . but a breach of that duty results in no liability for the very injury the duty was meant to protect against."); *see also Hoeffner v. The Citadel*, 429 S.E.2d 190, 193 (S. C. 1993) (same).

---

[4] The Court recognizes, of course, that some jurisdictions have indeed created a custodial prerequisite to actions alleging a common law duty to prevent suicide. *See, e.g., Winger v. Franciscan Med. Ctr.*, 701 N.E.2d 813, 820 (Ill. App. Ct. 1998) (finding duty created only when "the act of suicide was foreseeable, and the plaintiff was in the custody or control of the physician or hospital at the time he acted"); *but see Hobart v. Shin*, 705 N.E.2d 907 (Ill. 1998) (permitting comparative negligence arguments in case against psychiatrist where outpatient decedent committed suicide). In these cases, the courts have stated that as a result of the health care provider's custody and control over the patient, it has essentially "assumed the patient's duty of self-care[.]" *Maunz v. Perales*, 76 P.3d 1027, 1034 (Kan. 2003). However, as our analysis reveals, this Court simply has not previously adopted such a prerequisite, nor does it find it necessary to do so under the facts of this case.

In that regard, respondents attempt to distinguish our previous case of *Martin.* *See* 190 W. Va. 286, 438 S.E.2d 318. In *Martin*, a verdict against a psychiatrist who improperly released a patient who then committed suicide was upheld; respondents argue that the deviation from the standard of care in *Martin* occurred at the "custodial" level, i.e. when the decedent was in the facility. Clearly, however, a negligent failure to pursue efforts to admit a patient for inpatient care or monitoring is merely the flip side of the "negligent release" coin. Both raise the question of whether the health care provider has "failed to exercise that degree of care, skill and learning required or expected of a reasonable, prudent health care provider in the profession or class to which the health care provider belongs acting in the same or similar circumstances[.]" W. Va. Code § 55-7B-3(a)(1) (2003). As the *Kockelman* court observed:

> [P]sychiatrists owe a duty of care, consistent with standards in the professional community, to provide appropriate treatment for potentially suicidal patients, whether the patient is hospitalized or not. There is no reasonable basis for the distinction defendants seek to impose. Indeed, it would seem almost self-evident that doctors must use reasonable care with *all* of their patients in diagnosing suicidal intent and implementing treatment plans.

71 Cal. Rptr. 2d at 558; *see also Chirillo v. Granicz*, 199 So. 3d 246 (Fla. 2016) (recognizing mental health professional's duty to treat outpatient decedent who committed suicide defined by applicable standard of care).

Finally, we dispense with respondents' contention that a reversal of the circuit court's ruling would abrogate our purported prior determination that "*as a matter of*

11

*law*, non-custodial suicide constitutes an intervening, superseding act that undercuts any attachment of duty." (emphasis added).  Respondents cite no authority for this boldly stated proposition and, in fact, the very case upon which they rely—*Moats*—plainly undermines it.  Aside from dicta making a general, historical observation that suicide has been treated as an intentional act, this Court has never found it to be an outright bar as a matter of law— hence, the certified question to that effect in *Moats*.[5]  In fact, shortly after *Moats*, in a Russian roulette case (which was analyzed as akin to suicide), the Court reiterated that it "has consistently dealt with the determination of intervening cause within the framework of the proximate cause analysis and has relegated the task of resolution of these matters to the jury[.]" *Harbaugh v. Coffinbarger*, 209 W. Va. 57, 65, 543 S.E.2d 338, 346 (2000). The *Harbaugh* Court paused to "emphasize[] the significant role of the concept of foreseeability in the determination of intervening cause" by citing syllabus point thirteen of *Anderson v. Moulder*, 183 W. Va. 77, 394 S.E.2d 61 (1990):  "A tortfeasor whose negligence is a substantial factor in bringing about injuries is not relieved from liability by the intervening acts . . . if those acts were reasonably foreseeable by the original tortfeasor at the time of his negligent conduct." *Id*. at 64, 543 S.E.2d at 345.

We therefore find that the circuit court erred by concluding that our precedent contains a "custodial" prerequisite for claims based on deviations from the standard of care

---

[5] The question posed by the circuit court in *Moats* was, "[a]re the Plaintiff's claims barred by the fact that the decedent committed suicide?"  The answer was an unequivocal "no."  206 W. Va. at 11, 521 S.E.2d at 183.  Regardless, had such a per se bar been well-established, there would have been little need to certify the question.

proximately resulting in a patient's suicide, and accordingly that petitioner's claims were barred as a matter of law.

## IV. CONCLUSION

For the reasons set forth above, we reverse the August 26, 2020, order of the Circuit Court of Ohio County and remand for further proceedings.

Reversed and remanded.