Filed 5/2/16  Finnigan v. CLE of Monterey CA6

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SIXTH APPELLATE DISTRICT

| | |
|---|---|
| TIMOTHY FINNIGAN et al., | H042124 |
| Plaintiffs and Appellants, | (Monterey County Super. Ct. No. M117861) |
| v. | |
| CLE OF MONTEREY, LLC, | |
| Defendants and Respondents. | |

## I.  INTRODUCTION

At the time of his tragic death, Matthew Finnigan was a participant in the "College Living Experience" program provided by respondent CLE of Monterey, LLC (CLE).  CLE's post-secondary program was designed to provide young adults with special needs assistance in achieving independence, including tutoring and the development of independent living skills.  Another participant in the CLE program was James Torrey Hill.  Matthew,[1] who was autistic, was visiting Hill in Hill's private apartment in September 2010 when Hill fatally stabbed him in the back with a kitchen knife.

---

[1] Since the Finnigan family members have the same surname, we will refer to them by their first names for purposes of clarity and not out of disrespect.

Matthew's parents, appellants Timothy and Patricia Finnigan, brought the instant wrongful death action against CLE, in which they assert causes of action for negligence, breach of written contract, breach of oral contract, intentional misrepresentation, negligent misrepresentation, and dependent adult abuse (Welf. & Inst. Code, § 15600 et seq.).[2] The trial court granted CLE's motion for summary judgment on the grounds that each cause of action lacked merit as a matter of law. For the reasons stated below, we conclude that the trial court did not err and we will affirm the judgment.

## II. FACTUAL BACKGROUND

Our factual summary is drawn from the parties' separate statements of fact and the admissible evidence submitted in connection with the motion for summary judgment.

### A. *Post-High School Background*

Matthew had been diagnosed as autistic and was qualified for assistance from the Regional Center of the East Bay. When Matthew graduated from high school, his father, Timothy, was concerned that Matthew did not have independent living skills. At age 19, Matthew moved from the family home to a group home in Pittsburg. He later lived in another home in Pittsburg with roommates.

After Matthew was injured in an automobile accident, he received a diagnosis of paranoid schizophrenia. He then lived in transitional housing. At some point, Matthew attended Diablo Valley College. He also had a job at the Century Theater for about 18 months.

### B. *The Agreement for CLE Services*

In 2009, when Matthew was 24 years old, he (as the participant) and his father (as the sponsor) entered into a one-year agreement for services with CLE. They entered in a second one-year agreement for services with CLE for the period of July 1, 2010, to

---

[2] All further statutory references are to the Welfare and Institutions Code unless otherwise indicated.

2

July 31, 2011).  The second agreement (hereafter, the CLE agreement) was in effect at the time of Matthew's death in September 2010.  The Regional Center of the East Bay paid Matthew's fees for the CLE program.

The CLE agreement included the following description of the program:  "College Living Experience is a non-therapeutic post-secondary support program (the 'CLE Program') designed to provide assistance to young adults with varying ranges and types of special needs to achieve independence.  CLE offers a complete network of comprehensive services that includes educational support, independent living skills, and social skills, as well as support in transitioning into the workforce."

The CLE agreement also specified the services that CLE would provide "for the benefit of Participant:  [¶]  (i) coordination of educational support and obtaining a residence;  [¶]  (ii) scheduled tutoring in its offices at least two times per week with additional sessions to be added per agreement of student and staff.  [¶]  (iii) development of independent living skills, including household maintenance, meal planning and preparation, and financial skills, with weekly meetings until proficiency is demonstrated;  [¶]  (iv) a reasonable number of supervised social activities with other Program participants scheduled according to the discretion of CLE; and  [¶]  (v) periodic written and/or oral reports detailing the level of independent performance obtained by Participant to Participant and/or Sponsor."  As to the services that CLE would not provide, the CLE agreement stated:  "CLE will not provide therapeutic treatment or 24-hour supervision."

The CLE agreement obligated Matthew, as the participant in the CLE program, to "attend and participate in all instructional sessions," "maintain a habitable and presentable home," and follow his "budget plan and pay all bills as scheduled."  Matthew was also obligated to attend school or a vocational regimen, attend work or an internship if applicable, and comply with the rules of conduct.  In addition, Matthew and his father consented to the following:  (1) inspection of Matthew's residence by CLE personnel and

3

removal of items that violated the rules of conduct; (2) academic, medical, psychological, occupational and other testing as recommended by CLE; (3) random drug testing; and (4) restriction or termination of Matthew's use of CLE computers if inappropriate websites were accessed.

The waiver and release provision included in the CLE agreement states: "Participant and Sponsor acknowledge and agree that there are inherent risks associated with an independent living program and with living in a major metropolitan area such as Monterey, California. Participant hereby assumes these risks and takes full responsibility for his or her own safety and well-being at all times. Participant and Sponsor hereby release CLE . . . from any and all losses, claims, damages, expenses, liabilities or obligations (other than those expressly included in this Agreement) arising from Participant's participation in the CLE Program whether such loss, claims, damages, expenses, liabilities or obligations arise from the negligence of CLE or any of its officers, directors, agents, representatives or employees."

### C. *Participation in the CLE Program*

According to Amy Radochonski, a CLE vice president, CLE serves students who have "unique learning needs" and "require additional support to be learning how to live on their own or access post-secondary education and career opportunities." In 2009, the criteria for admission to the CLE program in Monterey included submission of an application, documentation regarding the student's disability, and participation in an on-site tour of CLE's center.

Matthew's mother, Patricia, believed that Matthew's participation in the first year of the CLE program "had done him some good" because he was happy and confident, and had started to keep his home cleaner and have better hygiene. She would not have let Matthew go on a CLE-sponsored trip to the Caribbean if she had felt that the CLE administrators were incompetent.

4

Hill was another student in CLE's program in Monterey. Radochonski recalled that Hill was admitted to the CLE program with a learning disability. She was not aware of any records showing that Hill had a mental health diagnosis. However, CLE staff had discussed creating a plan to transition Hill from the CLE program. Hill's case manager, Clare Manning, believed that Hill should not stay in the CLE program because he had failed a college class and had "various challenges," including "a pattern of fabricating or lying in a fantastical sort of way" and in his interactions with other CLE students. According to Manning, Hill's interactions with the other students were not physically aggressive or violent. However, she recalled two specific interactions that demonstrated Hill's challenges. Hill had taken a photograph of another student without her permission and had failed to "stand up for his friend who had his T-shirt torn" by another person during a dispute while they were visiting another CLE student's house.

CLE's Monterey program director, Rick Picar, stated that the staff discussion about transitioning Hill from the CLE program was not based upon any concerns that Hill posed a physical threat to other CLE students. Picar did not remember any student directly reporting to him anything about Hill. Hill's CLE tutor in the fall of 2009, Nancy Proto-Robinson, did not recall having any problems with Hill. Proto-Robinson was concerned about Hill's struggle with academics at college and his "middle school behaviors," such as writing a female student's name and telephone number on a college wall and shoplifting at Safeway. She also recalled that Hill was excited about "turning 21 and being able to buy alcohol legally."

Tony Schellenberger was formerly a resident advisor in CLE's Monterey program. He was instructed to check in on every CLE student at least once a week. As to Hill, Schellenberger never saw Hill "hit anybody" or "talk mean to anybody," or cause Schellenberger to be "afraid for another student's life or another student's safety with [Hill] there. . . ."

5

CLE's former admissions coordinator, Danielle Rice, remembered having a conversation with her superior at CLE in which she stated that Hill's diagnosis was not a good fit for CLE's program. She had witnessed Hill demonstrating aggressive behavior on two occasions when Hill was running around the CLE office "yelling and cussing." Rice was afraid that someone was going to be hurt in the CLE program because "some of the students that were being accepted in the program towards the end of the time that [she] was working there were not appropriate for the program based on the criteria that [she] was provided when [she] started." However, Rice never witnessed Hill being physically aggressive.

Another CLE student, Annamarie Torpey, stated that she had reported to Picar that she was worried about Hill because he "would lie all the time, drink a lot of alcohol, spread rumors, and say that he wished he was dead."

On September 22, 2010, Matthew was visiting Hill in Hill's private apartment in the early morning hours when Hill fatally stabbed him.[3] Matthew told the police officer who responded to Hill's apartment at 2:15 a.m. that he was playing a video game when Hill suddenly stabbed him in the back. Matthew also told the officer that he had known Hill for about one and one-half years and they were "friends with benefits" who had sex in the past. Before the stabbing, they had been drinking vodka (Matthew said he had consumed about one-half of a bottle) and they had not been arguing.

About 10 months before the murder, CLE staff confiscated a hunting knife from Hill. Hill's mother told Manning that Hill's father had a knife collection, that Hill must have gotten the knife from his father, and she did not want it returned to her.

---

[3] Plaintiffs do not dispute CLE's assertion that Hill stabbed Matthew with a kitchen knife.

## III.  PROCEDURAL BACKGROUND

### A.  *The Complaint*

The record reflects that the currently operative complaint is the second amended complaint filed by plaintiffs in March 2013 (hereafter, the complaint).  According to the allegations in the complaint, defendant CLE was negligent because CLE knew or should have known before Hill was admitted to the CLE program that Hill "suffered from severe mental illness, [and] had a history of severe emotional disturbance."  Defendants also knew or should have known that Hill's "problems and needs exceeded the parameters of the program and the level of training and experience of Defendants and their agents and employees.  Further, Defendants . . . knew or should have known that Hill constituted a danger to other disabled students enrolled in CLE, including [Matthew]."

After Hill was admitted to the CLE program, plaintiffs alleged, defendants knew or should have known that Hill bullied other students and enjoyed hurting people and animals; possessed knives and other weapons; was not medication compliant; and used illicit drug and alcohol.  Further, defendants' employees and/or agents had discussed Hill's "violent erratic behavior, mood swings, severe emotional disturbance and his unsuitability for the CLE program" during CLE staff meetings.  They also had recommended that defendants expel Hill from the CLE program but were told that Hill could not be expelled because defendants wanted the income from Hill's tuition and fees.  After a female student complained that she was afraid of Hill, defendants promised that Hill would attend anger management classes, but he never did so.  Defendants' employees or agents allegedly confiscated a hunting knife from Hill two months before Matthew's death.

Plaintiffs further alleged that defendants had failed to supervise the CLE students' social activities and their residence, failed to supervise the CLE students' medical and/or psychological fitness, and failed to monitor the students' suitability for the CLE program.  Additionally, defendants had failed to check in on students at night; failed to regularly

7

inspect their residents and remove items violating the rules of conduct; failed to recommend academic, medical, psychological, occupational and other testing; failed to conduct random drug testing of students; failed to limit or ban students' use of CLE computers if they accessed inappropriate websites; failed to request and review students' medical and psychiatric records before admission; and failed to expel any student who violated CLE's rules of conduct.

Plaintiffs also alleged that defendants had falsely informed plaintiffs that CLE did not accept students with serious psychological issues or criminal records; the safety of students was CLE's top priority; CLE staff were trained and equipped to regularly supervise the students and deal with behavioral issues; and students who violated the rules of conduct would be expelled.

Plaintiffs claimed that "[a]s a result of the wrongdoing of defendants and their agents and employees, and as a result of Defendants' failure to expel Hill from the [CLE] program, Hill murdered [Matthew] on September 22, 2010."

Based on these and other allegations, plaintiffs asserted causes of action for negligence, breach of written contract, breach of oral contract, intentional misrepresentation, negligent misrepresentation, and dependent adult abuse (§ 15600 et seq.).

**B.** *Motion for Summary Judgment*

CLE moved for summary judgment on the grounds that (1) the waiver and release clause in the CLE agreement signed by Matthew and Timothy released CLE from liability for negligence; (2) CLE did not have a special relationship with Matthew and owed no duty to protect him from the unforeseeable criminal conduct of Hill; (3) it was unforeseeable to CLE that Hill would murder Matthew, since it was undisputed that Hill had not exhibited any violent conduct while he was in the CLE program; (4) plaintiff Patricia was not a party to the CLE contract; (5) there was no evidence that CLE had breached the CLE contract; (6) the CLE contract contained an integration clause and

8

therefore the cause of action for breach of oral contract failed; (7) there was no evidence that CLE made any misrepresentations to plaintiffs; and (8) Matthew was not a dependent adult and there was no evidence of abuse or neglect within the meaning of section 15610.07.

### C. *Opposition to Motion for Summary Judgment*

Plaintiffs opposed the motion for summary judgment on several grounds. First, they contended that summary judgment could not be granted on the basis of the waiver and release provision in the CLE agreement, since the provision was invalid and unenforceable. Second, they contended that CLE owed a duty to Matthew either because CLE's misfeasance in "allow[ing] violent, anti-social behavior to flourish in its program" made it reasonably foreseeable that an autistic student would become the victim of violence by a student such as Hill, or because CLE had a special relationship with Matthew.

Regarding each cause of action, plaintiffs argued that either CLE had failed to meet its burden on summary adjudication or there were triable issues of material fact. Summary adjudication of the cause of action for breach of written contract could not be granted, according to plaintiffs, because CLE had submitted no evidence to show that it had adhered to the terms of the contract; alternatively, the evidence showed that CLE had breached the contract by failing to provide the promised supervised afternoon and evening social activities. As to the cause of action for breach of oral contract, plaintiffs asserted that the written contract had no force and effect and therefore CLE's obligations were governed by the oral contract.

Similarly, plaintiffs argued that CLE had failed to meet its burden on summary adjudication with respect to the causes of action for intentional and negligent misrepresentation; alternatively, plaintiffs had presented evidence that CLE made numerous false representations and misrepresentations regarding the CLE program.

Finally, plaintiffs maintained that summary adjudication of the cause of action for dependent adult abuse (§ 15610 et seq.) could not be granted because the evidence showed that Matthew qualified as a dependent adult and there were triable questions of fact as to whether CLE abused him by "allow[ing] him to be subjected to the psychopathic act of another student who was only in the program because of the money his presence provided."

**D.** *Trial Court Order and Judgment*

At the hearing on the motion for summary judgment, the trial court sought clarification of plaintiffs' position regarding the issue of foreseeability. Plaintiffs' counsel confirmed that it was their position that it was foreseeable due to Hill's "dangerous behavior" that Hill would murder Matthew, and the murder would not have happened if CLE had not admitted Hill or had dismissed Hill from the CLE program.

The trial court filed an amended ruling on December 15, 2014, granting the motion for summary judgment. The court determined that CLE had presented competent evidence sufficient to sustain a judgment as to all causes of action.

The trial court further found that plaintiffs' evidentiary showing was insufficient to preclude summary judgment, because plaintiffs had "failed to produce counter-affidavits and depositions that set forth relevant evidentiary facts in opposition, within the personal knowledge of the declarants, to which the declarants can testify competently if called as a witness. Specifically, [plaintiffs] have failed to show foreseeability on the part of the Defendant for the third party intervening criminal act that resulted in the death of Plaintiffs' adult son. An essential element of the tort of negligence, and a question of law for the Court, is whether a duty is owed by Defendant to the Plaintiffs. [Citation.] . . . Here, the evidence produced by the moving party demonstrates that Hill's murder of Finnigan on September 2, 2010, at an apartment privately leased by Hill, was unforeseeable by Defendant. Moreover, there is no connection between CLE's conduct in admitting students and performing services as set forth in the contract, and the murder

10

of Finn[i]gan. Competent evidence shows that employees of Defendant did not observe acts of violence by Hill and did [not] receive reports of acts of violence by Hill. The evidence demonstrates that Defendant was attempting to transition Hill out of the CLE program at the time of the incident for academic failure and immature disruptive behavior."

Further, the court stated: "Plaintiffs have failed to explain how CLE, a program to encourage independent living for adults with learning disabilities, could have foreseen that participant Hill would murder participant Finnigan in Hill's privately-leased apartment outside of program activity." The court also stated: "The wrongful conduct of Defendant as alleged by Plaintiffs is the failure of Defendant to vet Hill before admitting Hill to the program and the failure to expel Hill from the program. Plaintiffs have failed to provide competent evidence supporting the argument that expelling Hill from the program would have prevented the murder."

As to causes of action for breach of written and oral contracts, the trial court ruled that there were no evidentiary facts to show that the alleged contract breach caused the damage of "Plaintiffs' son's death by a criminal act." The causes of action for intentional and negligent misrepresentation also lacked merit, the trial court found, because "although the Plaintiffs perceived that oral representations concerning 24 hour supervision were made; reliance on such a representation conflicts with the fact that the participants lived in their own privately obtained housing, and not on a campus."

Finally, as to the cause of action for dependent adult abuse, the trial court determined that its finding of insufficient facts to show negligence showed that this cause of action also failed. The trial court did not rule on CLE's contention that the action was barred by the waiver and release provision in the CLE agreement.

Judgment in CLE's favor was entered in February 2015. The Plaintiffs filed a timely notice of appeal from the judgment.

11

# IV.  DISCUSSION

On appeal, plaintiffs generally contend that the summary judgment should be reversed because the trial court erred by improperly shifting the burden of proof to plaintiffs and failing to recognize plaintiffs' evidence in opposition to the motion for summary judgment.  Alternatively, plaintiffs contend that the summary judgment should be reversed because the trial court failed to rule on their objections to CLE's evidence.

We will begin our evaluation with the standard of review for an order granting summary judgment.

## A.  *The Standard of Review*

The standard of review for an order granting a motion for summary judgment is de novo.  (*Aguilar v. Atlantic Richfield Co.* (2001) 25 Cal.4th 826, 860 (*Aguilar*).)  The trial court's stated reasons for granting summary judgment are not binding on the reviewing court, "which reviews the trial court's ruling, not its rationale.  [Citation.]" (*Ramalingam v. Thompson* (2007) 151 Cal.App.4th 491, 498.)

In performing our independent review, we apply the same three-step process as the trial court.  "Because summary judgment is defined by the material allegations in the pleadings, we first look to the pleadings to identify the elements of the causes of action for which relief is sought."  (*Baptist v. Robinson* (2006) 143 Cal.App.4th 151, 159 (*Baptist*).)

"We then examine the moving party's motion, including the evidence offered in support of the motion."  (*Baptist*, *supra*, 143 Cal.App.4th at p. 159.)  A defendant moving for summary judgment has the initial burden of showing that a cause of action lacks merit because one or more elements of the cause of action cannot be established or there is a complete defense to that cause of action.  (Code of Civ. Proc., § 437c, subd. (o); *Aguilar, supra*, 25 Cal.4th at p. 850.)

If the defendant fails to make this initial showing, it is unnecessary to examine the plaintiff's opposing evidence and the motion must be denied.  However, if the moving

12

papers make a prima facie showing that justifies a judgment in the defendant's favor, the burden shifts to the plaintiff to make a prima facie showing of the existence of a triable issue of material fact. (Code of Civ. Proc., § 437c, subd. (p)(2); *Aguilar, supra*, 25 Cal.4th at p. 849.)

In determining whether the parties have met their respective burdens, "the court must 'consider all of the evidence' and 'all' of the 'inferences' reasonably drawn therefrom [citation], and must view such evidence [citations] and such inferences [citations], in the light most favorable to the opposing party." (*Aguilar, supra*, 25 Cal.4th at p. 843.) "There is a triable issue of material fact if, and only if, the evidence would allow a reasonable trier of fact to find the underlying fact in favor of the party opposing the motion in accordance with the applicable standard of proof." (*Id.* at p. 850, fn. omitted.) "Thus, a party 'cannot avoid summary judgment by asserting facts based on mere speculation and conjecture, but instead must produce admissible evidence raising a triable issue of fact. [Citation.]' [Citation.]" (*Dollinger DeAnza Associates v. Chicago Title Ins. Co.* (2011) 199 Cal.App.4th 1132, 1144-1145 (*Dollinger DeAnza*).)

Keeping the standard of review in mind, we will independently determine whether the motion for summary judgment should have been granted. In performing our review, we are also mindful that "[a]lthough our review of a summary judgment is de novo, it is limited to issues which have been adequately raised and supported in plaintiffs' brief. [Citations.]" (*Reyes v. Kosha* (1998) 65 Cal.App.4th 451, 466.)

**B.** *Negligence*

In the negligence cause of action, plaintiffs alleged that CLE had a duty to exercise reasonable care to prevent harm to Matthew due to their special relationship, and that CLE breached its duty by (1) admitting Hill to the CLE program when they knew or should have known he suffered from severe mental illness and had a history of violent actions; (2) knew or should have known that Hill had violated CLE's rules of conduct and constituted a physical danger to other CLE students; (3) knew or should have known

13

that Hill should be expelled from the CLE program; and (4) CLE's wrongful conduct was the proximate cause of Matthew's death.

To determine whether summary adjudication of the cause of action for negligence was properly granted, we first review the rules governing a cause of action for negligence arising from third party criminal conduct.

### 1. Liability for Third Party Criminal Conduct

"[I]n order to prevail in a negligence action, plaintiffs must show that defendants owed them a legal duty, that defendants breached that duty, and that the breach proximately caused their injuries. [Citation.]" (*Wiener v. Southcoast Childcare Centers, Inc.* (2004) 32 Cal.4th 1138, 1145 (*Wiener*).)

Accordingly, "[d]uty 'is an essential element' of the tort of negligence. [Citation.]" (*Melton v. Boustred* (2010) 183 Cal.App.4th 521, 529 (*Melton*).)  "Under traditional tort law principles, a person is not ordinarily liable for the actions of another and is under no duty to protect another person from harm. [Citation.]" (*Kockelman v. Segal* (1998) 61 Cal.App.4th 491, 498 (*Kockelman*).)

Thus, "there is no duty to act to protect others from the conduct of third parties. [Citations.]" (*Delgado v. Trax Bar & Grill* (2005) 36 Cal.4th 224, 235, fn. omitted (*Delgado*).)  In other words, " 'one "who has not created a peril is not liable in tort merely for failure to take affirmative action to assist or protect another" from the acts of a third party.' [Citations.]" (*Melton*, *supra*, 183 Cal.App.4th at p. 531.)

One exception to the general no-duty rule stated in *Delgado* is the " 'special relationship' doctrine." (*Delgado*, *supra*, 36 Cal.4th at p. 235.)  "A defendant may owe an affirmative duty to protect another from the conduct of third parties if he or she has a 'special relationship' with the other person. [Citations.]" (*Ibid.*)  This court has observed that "[s]uch a special relationship is typically where the plaintiff is particularly vulnerable and dependent upon the defendant who, correspondingly, has some control over the plaintiff's welfare. [Citation.]" (*Kockelman, supra*, 61 Cal.App.4th at p. 499; see also

14

*Melton*, *supra*, 183 Cal.App.4th at p. 535 [a special relationship generally involves some kind of dependency or reliance].)

"The existence of a special relationship, however, is only the beginning of the analysis. [Citations.]" (*Margaret W. v. Kelley R.* (2006) 139 Cal.App.4th 141, 152 (*Margaret W.*).) The California Supreme Court has recognized that "a duty to take affirmative action to control the wrongful acts of a third party will be imposed only where such conduct can be reasonably anticipated. [Citations.]" (*Ann M. v. Pacific Plaza Shopping Center* (1993) 6 Cal.4th 666, 676 (*Ann M.*), disapproved on another ground in *Reid v. Google, Inc.* (2010) 50 Cal.4th 512, 527, fn. 5 (*Reid*).) "Thus, even when a defendant has formed a special relationship with a plaintiff, courts uniformly hold that the defendant has no duty to protect the plaintiff from unforeseeable third party criminal conduct. [Citations.]" (*J.L. v. Children's Institute, Inc.* (2009) 177 Cal.App.4th 388, 396 (*J.L.*).)

In the context of premises liability, "in cases involving liability for third party criminal conduct, 'the requisite degree of foreseeability rarely, if ever, can be proven in the absence of prior similar incidents.' [Citations.]" (*Melton*, *supra*, 183 Cal.App.4th at pp. 537-538, quoting *Ann M.*, *supra*, 6 Cal.4th at p. 679.) Thus, where a minor was assaulted by another teenage invitee in the adult defendants' home, the defendants were not liable in the absence of any evidence that they had "*actual knowledge* of the assaultive propensities of the teenage assailant." (*Romero v. Superior Court* (2001) 89 Cal.App.4th 1068, 1081 (*Romero*).) The California Supreme Court has stated that "some types of crime might be foreseeable without prior similar incidents, so that a simple security measure might deter a particular act, or foreseeability might be shown by the occurrence of similar nonidentical events." (*Wiener*, *supra*, 32 Cal.4th at pp. 1150-1151.)

Our Supreme Court further stated in *Wiener* "that our cases analyze third party criminal acts differently from ordinary negligence, and require us to apply a heightened sense of foreseeability before we can hold a defendant liable for the criminal acts of third

15

parties. [Citation.] There are two reasons for this: first, it is difficult if not impossible in today's society to predict when a criminal might strike. Also, if a criminal decides on a particular goal or victim, it is extremely difficult to remove his every means for achieving that goal." (*Wiener*, *supra*, 32 Cal.4th at pp. 1149-1150.)

Accordingly, "foreseeability is the crucial factor." (*Margaret W.*, *supra*, 139 Cal.App.4th at p. 156.) "[N]o matter whether a heightened or lesser degree of foreseeability was required and no matter whether the actual crime committed or only similar conduct needed to be foreseen—foreseeability must be measured by what the defendant actually knew." (*Ibid.*; see also *J.L.*, *supra*, 177 Cal.App.4th at p. 397 [same].)

Finally, the foreseeability of third party criminal conduct, "when analyzed to determine the existence or scope of a duty, is a question of law to be decided by the court. [Citations.]" (*Ann M.*, *supra*, 6 Cal.4th at p. 678.)

### 2. Duty Analysis

In the present case, there is a dispute as to whether CLE had a special relationship with Matthew. For purposes of our analysis, we will assume, without deciding, that such a special relationship existed due to Matthew's participation in the CLE program. We therefore turn to an analysis of whether CLE had a duty of care to protect Matthew from Hill's criminal conduct because Hill's murder of Matthew was foreseeable under the heightened standard of foreseeability that applies to liability for third party criminal conduct. (See *Wiener*, *supra*, 32 Cal.4th at pp. 1149-1150; *Melton*, *supra*, 183 Cal.App.4th at pp. 537-538.)

On appeal, we understand plaintiffs to argue that summary adjudication of the cause of action for negligence was improperly granted because there are triable issues of fact as to whether Hill's murder of Matthew was foreseeable. According to plaintiffs, "[w]as it, for example, unforeseeable that Hill would harm another student when the staff at CLE were telling the directors that they were afraid Torrey Hill 'could hurt them or hurt someone in the program'? [Citation.] Was it unforeseeable when the court itself

admitted that defendant CLE was trying to transition him out of the program for acts of disruptive behavior?  [Citation.]  [¶]  Could there be no foreseeability when Hill was threatening other students?  [Citation.]  When Hill was himself announcing that he liked to hurt other people?"

In response, CLE argues that the trial court properly determined that CLE's evidence demonstrated that Hill's criminal act was unforeseeable to CLE and that plaintiffs failed to provide competent evidence showing the foreseeability of the act. We agree.

In moving for summary adjudication, CLE presented evidence showing that CLE staff had no knowledge of any prior similar incidents of criminal conduct by Hill (*Wiener*, *supra*, 32 Cal.4th at p. 1150-1151) and no knowledge that Hill had "assaultive propensities" (*Romero*, *supra*, 89 Cal.App.4th at p. 1081).  It is undisputed that CLE staff were in discussions to transition Hill from the CLE program in Monterey due to Hill's academic failure and, as the trial court described it, his "immature disruptive behavior." CLE staff had not witnessed any prior acts of violence by Hill or any prior acts of physical aggression, and none had been reported to CLE staff.  In short, CLE had no duty to protect Matthew by refusing to accept Hill into the CLE program or by expelling Hill from the program in the absence of any actual knowledge from which CLE could reasonably anticipate that Hill would murder another student.  (See *Ann M.*, *supra*, 6 Cal.4th at p. 676.)  Accordingly, CLE's showing was sufficient to show as a matter of law that CLE was not liable because plaintiffs could not establish the duty element of the cause of action for negligence.

Plaintiffs' evidence in opposition to summary adjudication of the cause of action for negligence is insufficient to create a triable issue of material fact regarding foreseeability because the evidence they rely upon is inadmissible.  We reiterate one of the important rules governing summary adjudication:  A party " 'cannot avoid summary judgment by asserting facts based on mere speculation and conjecture, but instead must

17

produce admissible evidence raising a triable issue of fact. [Citation.]' [Citation.]"
(*Dollinger DeAnza*, supra, 199 Cal.App.4th at pp. 1144-1145.)

Moreover, "[t]he same rules of evidence that apply at trial also apply to the declarations submitted in support of and in opposition to motions for summary judgment. Declarations must show the declarant's personal knowledge and competency to testify, state facts and not just conclusions, and not include inadmissible hearsay or opinion. (Code Civ. Proc., § 437c, subd. (d)[4]; [citation].) The declarations in support of a motion for summary judgment should be strictly construed, while the opposing declarations should be liberally construed. [Citation.] This does not mean that courts may relax the rules of evidence in determining the admissibility of an opposing declaration. Only *admissible evidence* is liberally construed in deciding whether there is a triable issue." (*Bozzi v. Nordstrom, Inc.* (2010) 186 Cal.App.4th 755, 761 (*Bozzi*).) The same rules of admissibility apply to deposition testimony submitted in opposition to a motion for summary judgment. (See Evid. Code, § 702 [except for expert testimony, "the testimony of a witness concerning a particular matter is inadmissible unless" the witness "has personal knowledge of the matter"].)

Plaintiffs argue on appeal that their evidence in opposition to the motion for summary adjudication shows that there are triable issues of fact regarding the foreseeability of Hill's murder of Matthew. They rely on the deposition testimony of Rice, the former admissions coordinator for CLE. Rice testified that Manning, a CLE case manager and psychologist, had reviewed Hill's file and discussed during a staff

---

[4] Code of Civil Procedure section 437c, subdivision (d) provides: "Supporting and opposing affidavits or declarations shall be made by a person on personal knowledge, shall set forth admissible evidence, and shall show affirmatively that the affiant is competent to testify to the matters stated in the affidavits or declarations. An objection based on the failure to comply with the requirements of this subdivision, if not made at the hearing, shall be deemed waived."

18

meeting that Hill was not a good fit for the program because the "red flags" related to "aggressive behaviors and violence and some issues with law enforcement or probation." The record does not show that Rice had personal knowledge of the contents of Hill's file, nor does the record contain any further information about Hill's unspecified prior "aggressive behaviors and violence."

Rice also stated in her deposition testimony that staff at CLE had told CLE's directors that they were afraid that Hill would harm another student or staff, that Hill had threatened other students, and he had announced that he liked to hurt people. However, as CLE stated in its evidentiary objections to Rice's deposition testimony, Rice admitted that she did not have any personal knowledge of Hill being involved in violence or in physical or verbal altercations. Rice testified: "The only incident I've ever seen was [Hill] throwing that angry tantrum in the hallway and him just saying statements like 'I'm violent. I like to hurt people.' But any violence and actual physical or verbal altercations are all from other staff members bringing it up for concerns during staff meetings. [¶] . . . [¶] Like I said, my interactions with him were fine." Absent personal knowledge, Rice's deposition testimony is insufficient to show that CLE had knowledge that Hill had committed prior similar acts of violence or had assaultive propensities, such that Hill's murder of Matthew was reasonably foreseeable. (See *Bozzi*, *supra*, 186 Cal.App.4th at p. 761; *Melton*, *supra*, 183 Cal.App.4th at p. 536.)

Plaintiffs also rely on the deposition testimony of Wendy Byrnes, a former CLE employee and parent of a CLE participant, as evidence that Hill had bullied other students and had to room by himself. Byrnes' testimony was not based on personal knowledge and did not provide evidence of prior similar incidents or a propensity for assault that was known to CLE, since Byrnes testified that she was told by CLE's academic advisor that Hill had stolen another student's mail and food and was bullying the student by calling him names. Her testimony is therefore insufficient to create a triable issue of material of fact regarding the foreseeability of Matthew's murder.

19

Plaintiffs' reliance on the testimony of another CLE parent, Carolyn Zaworski, is also insufficient to create a triable issue of material fact regarding foreseeability. Zaworski testified that Hill was her son's roommate and in September 2009 she had talked with Manning and "expressed [her] concern about the roommate situation and that . . . [she] was concerned about [Hill's] anger." Zaworski did not testify that she told Manning or any other CLE staff about any specific incidents or conduct involving Hill.

Plaintiffs also point to the evidence that CLE staff found a hunting knife that belonged to Hill, but this evidence is insufficient to create a triable issue of material fact because plaintiffs do not dispute defendants' contention that the hunting knife was confiscated from Hill about 10 months before Matthew's murder and was not used in the murder.

We therefore determine as a matter of law that CLE owed no duty to protect Matthew from Hill's criminal conduct because Hill's murder of Matthew was not foreseeable under the heightened standard of foreseeability that applies to third party criminal conduct. (See *Wiener*, *supra*, 32 Cal.4th at pp. 1149-1150; *Ann M.*, *supra*, 6 Cal.4th at pp. 676-679.) Since plaintiffs cannot establish the duty element of their negligence cause of action, we also determine that summary adjudication was properly granted.

### 3. Causation Analysis

Even assuming that there is a triable issue of material fact regarding whether Matthew's murder by Hill was foreseeable and therefore CLE breached its duty to expel Hill, we would find that plaintiffs cannot establish the causation element of the cause of action for negligence. (See *Wiener*, *supra*, 32 Cal.4th at p. 1145 [plaintiffs must show that defendant's breach of duty proximately caused their injuries].)

The California Supreme Court has stated that proximate cause is "sometimes referred to as 'but for' causation. [Citation.]" (*State Dept. of State Hospitals v. Superior Court* (2015) 61 Cal.4th 339, 354, fn. omitted (*State*).) "[T]he purpose of the 'but for'

requirement is to safeguard against speculative and conjectural claims." (*Id*. at p. 356.) " 'Ordinarily, proximate cause is a question of fact which cannot be decided as a matter of law from the allegations of a complaint. . . . Nevertheless, where the facts are such that the only reasonable conclusion is an absence of causation, the question is one of law, not of fact.' [Citations.]" (*Id.* at p. 353.)

In *State*, our Supreme Court determined that the State Department of Mental Health's alleged breach of a mandatory duty to use two evaluators to determine whether a person should be committed as a sexually violent predator was not, as a matter of law, the proximate cause of the victim's murder and rape by a convicted rapist who was deemed suitable for release on parole by one evaluator. (*State, supra,* 61 Cal.4th at pp. 356-357.) The court ruled that the "failure to appoint a second evaluator cannot properly be considered a proximate cause of [the rapist's] heinous crime." (*Id*. at pp. 356-357.) "As a matter of cause in fact it is conjectural. . . ." (*Id*. at p. 357.)

The present case is similarly speculative. The record reflects that the murder occurred when Matthew was visiting Hill in Hill's private apartment in the early morning hours. Matthew told the police officer who responded to Hill's apartment at 2:15 a.m. that he was playing a video game when Hill suddenly stabbed him in the back. Matthew also told the officer that he had known Hill for about one and one-half years and they were "friends with benefits" who had sex in the past. Before the stabbing, they had been drinking vodka.

At the time of the murder, Matthew and Hill therefore had a social relationship that undisputedly took place, as the trial court found, outside of CLE program activities and outside CLE premises. On these facts, the only reasonable conclusion is the absence of causation, since it is speculative to claim that if CLE had expelled Hill from the CLE program, the social relationship would have immediately ended, Matthew would not have been present in Hill's apartment, and Hill would not have stabbed him. (*State*, *supra*, 61 Cal.4th at p. 353.)

21

We therefore determine that even assuming that there are triable issues of material fact regarding the foreseeability of Matthew's murder by Hill, as a matter of law plaintiffs cannot establish the causation element of the cause of action for negligence.

### C. *Breach of Written Contract*

In the cause of action for breach of written contract, plaintiffs alleged that Timothy and Matthew had entered into a written contract with CLE that CLE breached by "failing to 'supervise afternoon and evening social activities,' and failing to supervise and monitor students' residences, computer usage and medical and/or psychological fitness or suitability for program participation." Plaintiffs further alleged that CLE's breach of the written contract was the proximate cause of Matthew's death.

On appeal, plaintiffs contend that the trial court erred in granting summary adjudication of the breach of written contract cause of action because CLE failed to provide evidence showing that CLE did not breach the contract or that plaintiffs lacked evidence of a breach of contract.

CLE responds that the trial court properly granted summary adjudication on the ground that the record lacks any evidentiary facts to show that the CLE agreement was breached or that the alleged breach of contract was the cause of Matthew's death by a criminal act. As we will explain, we find the causation issue to be dispositive.

"[T]he elements of a cause of action for breach of contract are (1) the existence of the contract, (2) plaintiff's performance or excuse for nonperformance, (3) defendant's breach, and (4) the resulting damages to the plaintiff. [Citation.]" (*Oasis West Realty, LLC v. Goldman* (2011) 51 Cal.4th 811, 821.) "Causation of damages in contract cases, as in tort cases, requires that the damages be proximately caused by the defendant's breach, and that their causal occurrence be at least reasonably certain. (Civ. Code, §§ 3300, 3301.)" (*Vu v. California Commerce Club, Inc.* (1997) 58 Cal.App.4th 229, 233 (*Vu*).) As we have noted, proximate cause is "sometimes referred to as 'but for'

22

causation." (*State*, *supra*, 61 Cal.4th at p. 354.) "[T]he purpose of the 'but for' requirement is to safeguard against speculative and conjectural claims." (*Id*. at p. 356.)

In the present case, even assuming that the evidence shows, as plaintiffs allege, that CLE breached the written agreement by "failing to 'supervise afternoon and evening social activities,' and failing to supervise and monitor students' residences, computer usage and medical and/or psychological fitness or suitability for program participation," no triable issue of material fact is created regarding causation. Based on such evidence, we may only speculate that absent CLE's alleged breaches of contractual obligations to generally supervise and monitor the students, the murder would not have occurred in the early morning hours when Matthew and Hill were socializing in Hill's private apartment. (See *State*, *supra*, 61 Cal.4th at p 356.) Therefore, " 'the only reasonable conclusion is an absence of causation.' " (*Id.* at p. 353.)

Moreover, there is nothing in the record to suggest that CLE had a contractual obligation to constantly monitor the CLE students' private apartments and medical and/or psychological fitness. Similar to the decision in *Crow v. State of California* (1990) 222 Cal.App.3d 192, 209 (*Crow*), which involved an assault on a college student during a dormitory party, CLE "could 'not have prevented this incident from taking place except *possibly* by posting guards in [Hill's apartment] on a 24-hour, 365-day per year basis.' "

We therefore determine as a matter of law that plaintiffs cannot establish that CLE's alleged breaches of the written CLE agreement were the proximate cause of Matthew's death. (See *State, supra,* 61 Cal.4th at p. 353.) Since the cause of action for breach of written contract therefore lacks merit, we determine that summary adjudication was properly granted. (Code Civ. Proc., § 437c, subd. (o); *Aguilar, supra*, 25 Cal.4th at p. 850.)

**D.** *Breach of Oral and/or Implied Contract*

In their cause of action for breach of oral and/or implied contract, plaintiffs alleged that CLE made oral and/or implied promises subsequent to the execution of the written

CLE agreement, including a promise to terminate any student who violated the CLE rules of conduct by violating laws, using illegal substances, possessing weapons, engaging in conduct likely to endanger other students, being rude or abusive to CLE staff or students, and consuming or selling alcohol or mind-altering substances.

Plaintiffs further alleged that CLE did not comply with these oral and/or implied promises because CLE failed "to terminate promptly CLE student Hill upon observing and learning of his violations of the CLE rules of conduct. . . ." They asserted that CLE's breach of the oral and/or implied contract was the cause of Matthew's death.

Plaintiffs argue on appeal that their cause of action for breach of oral or implied contract is not barred by the integration clause in the written CLE agreement,[5] since the written agreement is vague and uncertain and Patricia was not a party to it.

CLE disagrees, relying on the integration clause in the written CLE agreement as a bar to the claimed oral or implied contract, and asserting that Patricia testified that she is suing only on the 2009 and 2010 written CLE agreements.

The trial court ruled that there were no evidentiary facts to show that the alleged contract breach caused the damage of "[p]laintiffs' son's death by a criminal act." We agree. "The elements of a breach of oral contract claim are the same as those for a breach of written contract: a contract; its performance or excuse for nonperformance; breach; and damages. [Citations.]" (*Stockton Mortgage, Inc. v. Tope* (2014) 233 Cal.App.4th 437, 453.) As we have emphasized, "[c]ausation of damages in contract cases . . . requires that the damages be proximately caused by the defendant's breach, and that their

---

[5] Paragraph 11 of the CLE agreement states: "This Agreement, including the attached schedules, contains the entire understanding of the parties with respect to the matters set forth herein, merging and superseding all prior and contemporaneous agreements and understandings between the parties with respect to such matters. This Agreement may be amended only by a written instrument executed by all parties."

causal occurrence be at least reasonably certain. (Civ. Code, §§ 3300, 3301.)" (*Vu, supra*, 58 Cal.App.4th at p. 233.)

Having determined as a matter of law that plaintiffs cannot establish that the claimed breaches of the written CLE agreement caused Matthew's death, we reach a similar conclusion regarding the claim that CLE breached an oral or implied promise to terminate any student who violated the CLE rules of conduct. Even assuming the existence of an oral or implied contract as plaintiffs allege, the only reasonable conclusion is that the claimed breach of the oral or implied contract was not the proximate cause of Hill's murder of Matthew. As we have discussed, on the facts of this case it is speculative or conjectural to claim that but for CLE's failure to expel Hill for violating the rules of conduct, Hill would not have murdered Matthew. Speculation and conjecture are not sufficient to establish proximate cause. (*State, supra*, 61 Cal.4th at p. 356.)

Accordingly, we determine as a matter of law that plaintiffs cannot establish that CLE's alleged breach of an oral or implied contract was the proximate cause of Matthew's death. (See *State, supra,* 61 Cal.4th at p. 353.) Since the causation element of the cause of action for breach of oral or implied contract cannot be established, we determine that summary adjudication was properly granted. (See Code Civ. Proc., § 437c, subd. (o); *Aguilar, supra*, 25 Cal.4th at p. 850.)

### E. *Intentional and Negligent Misrepresentation*

In the causes of action for intentional and negligent misrepresentation, plaintiffs alleged that they relied on CLE's misrepresentations to enroll Matthew in the CLE program and to maintain his enrollment. The alleged misrepresentations included the following: CLE would review prospective students' medical records; no student with serious psychological issues would be admitted; CLE's staff had the requisite licensing, training, and experience; the safety and security of CLE students was CLE's top priority; "CLE is a 24 hour monitoring program;" students were not allowed to have alcohol in

25

their apartment or possess weapons; students who violated the rules of conduct or were violent would be expelled; resident advisors would make frequent visits to students' residences; and students would meet with their advisors, tutors, and mentors weekly.

Plaintiffs contend on appeal that the trial court erred in granting summary adjudication of the intentional and negligent misrepresentation causes of action because Rice, the former CLE admissions coordinator, testified in her deposition that CLE misrepresented the program's social activities, including telling prospective parents, erroneously, that CLE held social activity meetings every night. They also contend that CLE induced them to send Matthew to the CLE program by representing that CLE was a safe program for people with autism, there was 24-hour supervision of students, and students would be paired with roommates based on their level of functioning.

In response, CLE emphasizes that Rice did not testify that she told Timothy that there were social activities every night, and Timothy testified that he knew that CLE did not provide 24-hour supervision.

Having reviewed the evidence, we determine that there is no evidence to support the allegations that Rice or any other CLE representative told plaintiffs that there would be 24-hour supervision of CLE students and nightly social activities. Rice testified in her deposition that she "was supposed to notify parents . . . that there was 24-hour supervision for students." She did not testify that she actually told plaintiffs that Matthew would have 24-hour supervision. Similarly, although Rice testified that she was instructed to tell parents that CLE students would be paired as roommates with students of "like disability," there is no evidence that Rice told that to plaintiffs or that Matthew and Hill were roommates.

Moreover, Timothy testified in his deposition that he had read the CLE agreement and understood that CLE did not provide 24-hour supervision. Timothy also testified that no one from CLE told him that CLE would make sure that the students were in their apartments by 10:00 p.m., and he did not think that Matthew would be supervised by

26

CLE when he visited a friend in an apartment. Timothy also testified that he was told that Matthew would be supervised by CLE staff at dinner functions and outings.

Even assuming, however, that there are triable issues of material fact regarding the alleged misrepresentations, we would again find the causation issue to be dispositive. As we will explain, we determine that the trial court properly ruled that, with regard to the misrepresentation causes of action, that there were no evidentiary facts to show that the alleged misrepresentations caused "[p]laintiffs' son's death by a criminal act."

Both the cause of action for intentional misrepresentation and negligent misrepresentation have a causation element. The elements of a cause of action for intentional misrepresentation are "(1) a misrepresentation, (2) knowledge of falsity, (3) intent to induce reliance, (4) actual and justifiable reliance, and (5) resulting damage. [Citations.]" (*Chapman v. Skype Inc.* (2013) 220 Cal.App.4th 217, 230-231.) The elements of a cause of action for negligent misrepresentation are the same, "except that it does not require knowledge of falsity but instead requires a misrepresentation of fact by a person who has no reasonable grounds for believing it to be true. [Citations.]" (*Id.* at p. 231.)

Thus, "damage causation is an essential element of any cause of action for fraud or negligent misrepresentation." (*Small v. Fritz Companies, Inc.* (2003) 30 Cal.4th 167, 202.) This court has stated that "[i]n order to recover for fraud, as in any other tort, the plaintiff must plead and prove the 'detriment proximately caused' by the defendant's tortious conduct. (Civ. Code, § 3333.) Deception without resulting loss is not actionable fraud. [Citation.]" (*Service by Medallion, Inc. v. Clorox Co.* (1996) 44 Cal.App.4th 1807, 1818.)

In this case, even if CLE had misrepresented that CLE provided 24-hour supervision for CLE students and held social activities every night, and the plaintiffs had relied upon this intentional or negligent misrepresentation in enrolling Matthew in the CLE program, " 'the only reasonable conclusion is an absence of causation.' " (*State*,

*supra*, 61 Cal.4th at p. 353.) We reiterate that as in *Crow*, *supra*, 222 Cal.App.3d at page 209, CLE "could 'not have prevented this incident from taking place except *possibly* by posting guards in [Hill's apartment] on a 24-hour, 365-day per year basis.' " In other words, a jury could not reasonably conclude that but for CLE's intentional or negligent misrepresentation regarding 24-hour supervision and nightly social activities, Hill would not have murdered Matthew in the early morning hours when they were socializing in Hill's private apartment. (See *Weissich v. County of Marin* (1990) 224 Cal.App.3d 1069, 1083.)

We therefore determine as a matter of law that plaintiffs cannot establish the causation element of the causes of action for intentional and negligent misrepresentation. (See *State*, *supra*, 61 Cal.4th at p. 353.) Therefore, the trial court did not err in granting summary adjudication.

### F. Dependent Adult Abuse

In their cause of action for dependent adult abuse, plaintiffs alleged that Matthew was a dependent adult within the meaning of section 15610.23 and that "[t]he conduct of Defendants caused [Matthew] and Plaintiffs to allow [Matthew] to remain as a CLE disabled student, which ultimately lead to [Matthew's] death at the hands of Hill." More specifically, plaintiffs alleged that CLE "knew or should have known that Hill constituted a serious danger to CLE students including [Matthew], but intentionally hid this knowledge from [Matthew] and Plaintiffs in order to continue to receive tuition payments from Hill and Plaintiffs."

According to plaintiffs, the trial court erred in granting summary adjudication of the dependent adult abuse cause of action because there is a factual dispute as to whether Matthew was a dependent adult. Plaintiffs also contend that the trial court erred in ruling that the cause of action failed due to insufficient facts to show that CLE was negligent.

28

CLE asserts that the trial court properly granted summary adjudication of the dependent adult cause of action because, even assuming that Matthew was a dependent adult, there was no evidence that CLE was his caretaker or that CLE had abused him.

Section 15610.23, subdivision (a) defines a dependent adult as "any person between the ages of 18 and 64 years who resides in this state and who has physical or mental limitations that restrict his or her ability to carry out normal activities or to protect his or her rights, including, but not limited to, persons who have physical or developmental disabilities. . . ." For purposes of our analysis, we will assume, without deciding, that Matthew was a dependent adult within the meaning of the statute.

" 'Abuse of an elder or a dependent adult' means either of the following: [¶] (1) Physical abuse,[6] neglect,[7] financial abuse, abandonment, isolation, abduction, or

---

[6] Section 15610.63 provides: " 'Physical abuse' means any of the following: [¶] (a) Assault, as defined in Section 240 of the Penal Code. [¶] (b) Battery, as defined in Section 242 of the Penal Code. [¶] (c) Assault with a deadly weapon or force likely to produce great bodily injury, as defined in Section 245 of the Penal Code. [¶] (d) Unreasonable physical constraint, or prolonged or continual deprivation of food or water. [¶] (e) Sexual assault, that means any of the following: [¶] (1) Sexual battery, as defined in Section 243.4 of the Penal Code. [¶] (2) Rape, as defined in Section 261 of the Penal Code. [¶] (3) Rape in concert, as described in Section 264.1 of the Penal Code. [¶] (4) Spousal rape, as defined in Section 262 of the Penal Code. [¶] (5) Incest, as defined in Section 285 of the Penal Code. [¶] (6) Sodomy, as defined in Section 286 of the Penal Code. [¶] (7) Oral copulation, as defined in Section 288a of the Penal Code. [¶] (8) Sexual penetration, as defined in Section 289 of the Penal Code. [¶] (9) Lewd or lascivious acts as defined in paragraph (2) of subdivision (b) of Section 288 of the Penal Code. [¶] (f) Use of a physical or chemical restraint or psychotropic medication under any of the following conditions: [¶] (1) For punishment. [¶] (2) For a period beyond that for which the medication was ordered pursuant to the instructions of a physician and surgeon licensed in the State of California, who is providing medical care to the elder or dependent adult at the time the instructions are given. [¶] (3) For any purpose not authorized by the physician and surgeon."

[7] Section 15610.57 provides: " (a) 'Neglect' means either of the following: [¶] (1) The negligent failure of any person having the care or custody of an elder or a dependent adult to exercise that degree of care that a reasonable person in a like position (continued)

29

other treatment with resulting physical harm or pain or mental suffering.  [¶]  (2) The deprivation by a care custodian of goods or services that are necessary to avoid physical harm or mental suffering."  (§15610.07.)

We begin our analysis by observing that plaintiffs have not claimed that CLE committed dependent adult abuse by physically abusing Matthew, or by committing financial abuse, abandonment, isolation, abduction, or "other treatment" within the meaning of section 15610.07.  We therefore construe plaintiffs' argument as follows: Summary adjudication was improperly granted because the evidence shows that CLE committed neglect of Matthew, a dependent adult, by concealing Hill's dangerousness from Matthew and plaintiffs.

Section 15610.57, subdivision (a)(1) provides the statutory definition of neglect: " 'Neglect' means . . . [t]he *negligent failure* of any person having the care or custody of an elder or a dependent adult to exercise that degree of care that a reasonable person in a like position would exercise."  (Italics added.)  The statutory definition of "neglect refers . . . to the 'failure of those responsible for attending to the basic needs and comforts of elderly or dependent adults, regardless of their professional standing, to carry out their custodial obligations.'  [Citation.]"  (*Covenant Care, Inc. v. Superior Court* (2004) 32 Cal.4th 771, 783.)

---

would exercise.  [¶]  (2) The negligent failure of an elder or dependent adult to exercise that degree of self care that a reasonable person in a like position would exercise.  [¶] (b) Neglect includes, but is not limited to, all of the following:  [¶]  (1) Failure to assist in personal hygiene, or in the provision of food, clothing, or shelter.  [¶]  (2) Failure to provide medical care for physical and mental health needs.  No person shall be deemed neglected or abused for the sole reason that he or she voluntarily relies on treatment by spiritual means through prayer alone in lieu of medical treatment.  [¶]  (3) Failure to protect from health and safety hazards.  [¶]  (4) Failure to prevent malnutrition or dehydration.  [¶]  (5) Failure of an elder or dependent adult to satisfy the needs specified in paragraphs (1) to (4), inclusive, for himself or herself as a result of poor cognitive functioning, mental limitation, substance abuse, or chronic poor health."

We determine that even assuming, without deciding, that CLE had the care or custody of Matthew within the meaning of section 15610.57, subdivision (a)(1), the trial court correctly ruled that plaintiffs could not establish that CLE was negligent and therefore the cause of action for dependent elder abuse fails as a matter of law. As we have previously determined, plaintiffs cannot establish that CLE was negligent because, as a matter of law, CLE owed no duty to protect Matthew from Hill's criminal conduct because Hill's murder of Matthew was not foreseeable under the heightened standard of foreseeability that applies to third party criminal conduct. (See *Wiener*, *supra*, 32 Cal.4th at pp. 1149-1150; *Ann M.*, *supra*, 6 Cal.4th at pp. 676-679.)

For these reasons, we conclude that summary adjudication of the cause of action for dependent elder abuse was properly granted.

### G. Evidentiary Issue

Plaintiffs' final argument is that the summary judgment should be reversed because the trial court failed to rule on their objections to CLE's evidence in support of its motion for summary judgment. They maintain that "if this Court does not overturn the grant of summary judgment and remand the case with instruction to enter a denial of the motion, then it should require the trial court to do what it was required to do in the first place and rule on plaintiffs' evidentiary objections before it considers the appropriateness of summary judgment."

CLE agrees that the trial court did not rule on the parties' evidentiary objections. However, relying on the California Supreme Court's decision in *Reid*, *supra*, 50 Cal.4th 512, CLE contends that the trial court's failure to rule on evidentiary objections is not a ground for reversal of summary judgment.

Our review of the record shows that although the trial court did not make express rulings on each of the parties' evidentiary objections, the court indicated its rulings on

31

those evidentiary objections "pertinent to the disposition of the summary judgment motion." (*Reid*, *supra*, 50 Cal.4th at p. 532.)[8] In its amended ruling granting CLE's motion for summary judgment, the trial court stated: "The Court finds that Defendant and moving party have presented competent evidence sufficient to sustain a judgment as to all causes of action. The evidence includes deposition testimony of plaintiff Timothy Finnegan, Clare Manning, a case manager and psychologist, Rick Picard, the director of CLE, Nancy Proto-Robertson, Hill's tutor, and the written contract signed by the parties. . . ." The trial court also ruled that "[t]he Plaintiffs and responding parties have failed to produce counter-affidavits and depositions that set forth relevant evidentiary facts in opposition, within the personal knowledge of the declarants, to which the declarants can testify competently if called as a witness."

Moreover, we have addressed the evidentiary objections that we found pertinent to our independent review of the merits of CLE's summary judgment motion, in particular CLE's objections to the declaration of Rice, the former admissions coordinator for CLE. Therefore, as stated in *Reid*, "no purpose would be served in returning this matter to the trial court to re-review objections already considered by the Court of Appeal." (*Reid*, *supra*, 50 Cal.4th at p. 535.)

We therefore find no merit in plaintiffs' contention that the summary judgment should be reversed and the matter remanded for the trial court to rule on the parties' evidentiary objections.

### V.  DISPOSITION

The judgment is affirmed.

---

[8] Code of Civil Procedure section 437c, subdivision (q) currently states: "In granting or denying a motion for summary judgment or summary adjudication, the court need rule only on those objections to evidence that it deems material to its disposition of the motion. Objections to evidence that are not ruled on for purposes of the motion shall be preserved for appellate review."

_____
BAMATTRE-MANOUKIAN, J.


WE CONCUR:


_____
ELIA, ACTING P.J.


_____
MIHARA, J.